**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        klynn@bursor.com
        jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DASSAH MAKETA and BRYCE PEPPERS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VALNET INC. and VALNET U.S., INC. d/b/a SCREENRANT.COM,<br><br>Defendants. | Case No. 3:25-cv-05517-RS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Richard Seeborg |

## TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ........................................................................................ 1

THE PARTIES .......................................................................................................... 3

JURISDICTION AND VENUE ..................................................................................... 3

FACTUAL ALLEGATIONS .......................................................................................... 5

I.    THE CALIFORNIA INVASION OF PRIVACY ACT PROTECTS CALIFORNIANS' RIGHT TO CONTROL THE DISSEMINATION OF THEIR IDENTITIES ...................................................................................................... 5

II.   DEFENDANTS VIOLATE THE CIPA .................................................................. 7

      A.    The Mechanics And Privacy Implications Of IP Addresses ...................... 8

            1.    Differentiating Between Public And Private IP Addresses ........... 8

            2.    The Privacy Implications Of Public IP Addresses ..................... 11

      B.    The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers ................................................................................ 14

            1.    The ADNXS Tracker And The Data Brokers It Syncs With ...... 15

                  (i)     Experian/Tapad ......................................................... 19

                  (ii)    PubMatic .................................................................. 21

                  (iii)   LiveRamp (Screenrant Website) ................................ 25

            2.    The OpenX Tracker And The Data Brokers It Syncs With ........ 28

                  (i)     Epsilon/Lotame ......................................................... 31

                  (ii)    Magnite .................................................................... 35

III.  DEFENDANTS' CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ....................................... 39

      A.    Data Brokers and Real-Time Bidding: The Information Economy ......... 39

            1.    Data Brokers ........................................................................... 39

            2.    Real-Time Bidding .................................................................. 44

            3.    Cookie Syncing ....................................................................... 49

      B.    Defendants Use The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization .......................................... 52

C.    Defendants Use The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........................................................................54

IV.    PLAINTIFFS' EXPERIENCES ...........................................................................56

A.    Plaintiff Maketa .............................................................................................56

B.    Plaintiff Peppers ............................................................................................59

CLASS ALLEGATIONS ...............................................................................................62

CAUSES OF ACTION....................................................................................................64

PRAYER FOR RELIEF ..................................................................................................66

JURY DEMAND..............................................................................................................66

Plaintiffs Dassah Maketa and Bryce Peppers ("Plaintiff"), individually and on behalf of all others similarly situated, by and through their attorneys, makes the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendants Valnet Inc. and Valnet, U.S., Inc. ("Defendants") describe ScreenRant, which is part of their Screen Portfolio, as a "leading digital publication" and "trusted source[] of entertainment news and analysis, reaching billions of readers worldwide" through its website, https://screenrant.com/ (the "Screenrant Website").[1]

2.      Defendants also own and operate polygon.com, a digital platform for articles and other coverage of video games, movies, television shows, anime, and comics (the "Polygon Website") (together with the Screenrant Website, the "Websites").

3.      When users visit the Websites, Defendants cause at least two Trackers—the ADNXS Tracker and the OpenX Tracker (collectively, the "Trackers")—to be installed on the internet browsers of the Websites' visitors.  The Trackers are operated by separate and distinct third parties: Microsoft Corporation ("Microsoft") and OpenX Technologies, Inc. ("OpenX"), respectively (together the "Third Parties').

4.      Through their respective Trackers, the Third Parties collect the Website's users' internet protocol ("IP") addresses and other device identifier information such as device type, browser type, and unique and persistent identifiers ("Device Metadata").  The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers collect on subsequent visits, and which is used by the Third Parties to identify and de-anonymize the user.

5.      Defendants and the Third Parties use the data collected by the Trackers to identify and de-anonymize users, hyper-target advertisements to users, and to enrich themselves.

---

[1] VALNET INC., https://www.valnetinc.com/screenrant.

6.      Because the Trackers capture the Website's visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  Cal. Penal Code § 638.50(b).

7.      By installing and using the Trackers without Plaintiffs' prior consent and without a court order, Defendants violated CIPA § 638.51(a).

8.      The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata.  OpenX is a registered data broker in California[2] that focuses on identifying and de-anonymizing users through identity resolution services, and Microsoft syncs with registered data brokers on Defendants' Websites for this same purpose.  The purpose of this is to enrich the value of Defendants' Website users by linking those users' IP addresses and Device Metadata to profiles that contain as much personal and demographic information as possible.  Users are then offered up for sale with all this collated information to interested advertisers, with advertisers placing bids through platforms like Microsoft's.  Advertisers can then target Website users better based on these attributes and will therefore pay Defendants more to show advertisements to Defendants' users.  And the Third Parties share all this data between each other and with various other entities through a process called "cookie syncing," meaning Plaintiff's and Class Member's information winds up in the hands of untold numbers of third parties without consent.

9.      In sum, Defendants' scheme is to tie users' browsing activity on the Websites with personal information disclosed on another site—all captured by the Trackers—to sell this collated information to advertisers.  All of this enriches Defendants through advertising revenue, makes the Third Parties' services (*i.e.*, their Trackers) more valuable to Defendants and other customers, and strips Plaintiff and Class Members of their anonymity and privacy in the process.

---

[2] DATA BROKER REGISTRATION FOR OPENX TECHNOLOGIES, INC., https://oag.ca.gov/data-broker/registration/193614.

10.     Plaintiffs bring this action to prevent Defendants from further violating the privacy rights of California residents, and to recover statutory damages for Defendants' violation of CIPA § 638.51.

## THE PARTIES

11.     Plaintiff Dassah Maketa is a California citizen who, at all relevant times, resided in Fremont, California.  At all relevant times, Plaintiff Maketa was in California when she visited Defendants' Screenrant Website.

12.     Plaintiff Bryce Peppers is a California citizen who, at all relevant times, resided in San Francisco, California. Plaintiff Peppers was in California when he visited Defendants' Polygon Website.

13.     Defendant Valnet Inc. is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada.  Jointly with co-Defendant Valnet, U.S., Inc., Valnet Inc. operates and maintains media websites and digital channels, including those associated with its at least 25 brand properties.[3]

14.     Defendant Valnet, U.S., Inc. is a Delaware corporation based in Miami, Florida. Jointly with co-Defendant Valnet Inc., Valnet, U.S., Inc. operates and maintains media websites and digital channels, including those associated with its at least 25 brand properties.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than one Defendant.

16.     This Court has specific personal jurisdiction over Defendants because Defendants have consented to specific personal jurisdiction by omitting the defense from their Motion to Dismiss (ECF No. 18).  *See* Fed. R. Civ. P. 12(h)(1)(A)-(B).

---

[3] VALNET, https://www.valnetinc.com/en/about.

17.   In addition, through Defendants' installation and use of the Trackers on the Website, Defendants can engage in "programmatic advertising," which is the process of "buy[ing] and sell[ing] digital ads. Programmatic advertising serves up relevant ad impressions to audiences through automated steps, in less than a second."[4]  The Third Parties are players in the programmatic advertising space.

18.   By using the Trackers on its Website, Defendants target users with advertisements relevant to not only who they are, but where they are located.  That is, California users of the Website will see different advertisements than New York users of the Website based (in part) on location, as ascertained from their IP addresses.  Thus, Defendants purposefully availed themselves of the California market because they caused the Third Parties to collect the IP addresses and Device Metadata of Californians, using this information in conjunction with the Third Parties to target Californians with advertisements relevant to their location.

19.   Defendants reap substantial revenue from this unlawful disclosure of California users' information from its Website and, indeed, can monetize its Website (and its other websites) through programmatic advertising.

20.   Defendants also target California users knowingly, as they can sell specific California userbases to advertisers, or target advertising campaigns specifically at California users, as users are identified as being in California through their IP addresses.  *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 759 (9th Cir. 2025) ("Shopify knows about its California consumer base, conducts its regular business in California, contacts California residents, interacts with them as an intermediary for its merchants, installs its software onto their devices in California, and continues to track their activities.  This conduct connects Shopify to California in a meaningful way.") (cleaned up).

21.   This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this District.  In addition,

---

[4] WHAT IS PROGRAMMATIC ADVERTISING?,  https://advertising.amazon.com/blog/programmatic-advertising.

Defendants have consented to specific personal jurisdiction by omitting the defense from their Motion to Dismiss (ECF No. 18).  *See* Fed. R. Civ. P. 12(h)(1)(A)-(B).

**FACTUAL ALLEGATIONS**

**I.     THE CALIFORNIA INVASION OF PRIVACY ACT PROTECTS CALIFORNIANS' RIGHT TO CONTROL THE DISSEMINATION OF THEIR IDENTITIES**

22.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

23.     As the California Supreme Court has noted:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements*.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

24.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

25.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

26.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

27.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

28.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology has advanced, however, courts have expanded the application of these surveillance devices to Internet tracking technology.

29.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

30.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *Javier v. Assurance IQ, LLC* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").  This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

31.    For this reason, courts have regularly applied the CIPA to Internet tracking technologies such as those here.  *See, e.g.*, *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, --- F. Supp. 3d. ---, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Gabrielli*

*v. Motorola Mobility LLC*, at \*11-12 (N.D. Cal. July 14, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 40-41 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc.* 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.* 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

32.    Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.    DEFENDANTS VIOLATE THE CIPA

33.    To make Defendants' Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendants' server where the relevant Website's data is stored.  In response to the request, Defendants' server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendants' Website transmits instructions back to users' browsers in response to HTTP requests.  (See Figure 1.)

**Figure 1:**



34.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

35.    In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address and Device Metadata—to the Third Parties.

36.     The Third Parties' Trackers will also set a cookie corresponding with a user ID unique to their Tracker that also allows the user to be tracked across the Internet and have their information synced between multiple entities.

37.     Because, as described below, the Trackers collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Trackers are pen registers.

38.     Plaintiffs and Class Members did not provide their prior consent to Defendants to install the Trackers on their browsers or use the Trackers.  Nor did Defendants obtain a court order before installing or using the Trackers.

**A.     The Mechanics And Privacy Implications Of IP Addresses**

39.     An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.   While IPv6 adoption has been increasing, many networks still rely on IPv4.[5]

40.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

*1.     Differentiating Between Public And Private IP Addresses*

41.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

---

[5] See, e.g., *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

42.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

43.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

44.     A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

45.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

46.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  The public IP address determines the phone number who is making the call, which provides the most identifying information.  On the other hand, knowing whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household.

47.     The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications

(presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. On the other hand, private IP addresses effectively distinguish between users in the same household accessing a website.[6]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

48.     Thus, the differences between public and private IP addresses are as follows:[7]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[6] While the Trackers do not collect private IP addresses, as discussed below, the Trackers collect Device Metadata that distinguishes between devices accessing the same public IP address in the same way a private IP address would. So, by installing the Trackers on Website users' browsers, Defendants allow third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

[7] *What's The Difference Between A Public And Private IP Address?*, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

49.    A public IP address is therefore "routing, addressing, or signaling information."

50.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

51.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[8]

2.    *The Privacy Implications Of Public IP Addresses*

52.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[9]

53.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[10] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[11]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[12] because "[c]ompanies can use an IP address … to personally identify individuals."[13]

54.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving

---

[8]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[9]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[10]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[11] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[12]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[13]  Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[14]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[15]

55.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[16]

56.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[17]

57.    Thus, when Defendants install and use the Third Party Trackers, they know their conduct is specifically targeting and affecting Californians based on the public IP addresses.

58.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[18]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[19]

59.    Moreover, "IP address targeting can help businesses to improve their overall marketing strategy."[20]  "By analyzing data on which households or businesses are responding to their

---

[14] *See, e.g., The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[15] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[16] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[17] *Id.*

[18] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[19] *Id.*

[20] *Id.*

ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[21]

60.     The collection of IP addresses here is particularly invasive here given OpenX and a number of the entities the Third Parties sync with and whose trackers Defendant also installs on Website users' browsers[22] statuses as data brokers.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[23]

61.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, OpenX and the other data brokers mentioned herein specifically attach IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

62.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[24]

63.     Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could

---

[21] *Id.*

[22] As detailed herein, those entities include but are not limited to Experian/Tapad, PubMatic, LiveRamp, Epsilon/Lotame, and Magnite (the "Linked Data Brokers").

[23] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[24] *Is an IP Address Personal Data?, Convesio*, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civ. Code § 1798.140(v)(1)(A).[25]

**B.     The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers**

64.     When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[26]

65.     Oftentimes, third-party scripts are installed on websites "for advertising purposes."[27]

66.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[28]

67.     Defendants have incorporated the Trackers' code into the code of the Websites, including when Plaintiffs and Class Members visited the Website.

68.     When Plaintiffs and Class Members visited the Websites, the Websites' code—as programmed by Defendants—caused the Trackers to be installed on Plaintiffs' and Class Members' browsers.  This allows the Third Parties—through their respective Trackers—to collect Plaintiffs' and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

69.     The Trackers also caused additional data points to be sent from Plaintiffs' and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and

---

[25] A "consumer" is defined as "a natural person who is a California resident."  Cal. Civ. Code § 1798.140(i).)  A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services."  Cal. Civ. Code § 1798.140(1).)

[26] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[27] *Id.*

[28] *Id.*

compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

70.    Defendants and the Third Parties then used the public IP addresses, Device Metadata, and other information of Website visitors that are collected and sent by the Trackers, including those of Plaintiffs and Class Members, to deanonymize Plaintiffs and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

71.    At no time prior to the installation and use of the Trackers on Plaintiffs' and Class Members' browsers, or prior to the use of the Trackers, did Defendants procure Plaintiffs' and Class Members' consent for such conduct. Nor did Defendants obtain a court order to install or use the Trackers.

### 1.    The ADNXS Tracker And The Data Brokers It Syncs With

72.    Microsoft Corporation is a technology company with software-as-a-service products, such as Microsoft Advertising. Microsoft owns and operates the ADNXS Tracker, which it provides to website owners like Defendants for a fee. Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service. ADNXS is a DSP, as defined and described below.

73.    According to Microsoft, "[w]ith an integrated platform advantage and a focus on data-driven performance, [Microsoft] enables you to engage audiences on all screens and drive business results."[29]

74.    In other words, Microsoft facilities the selling of Defendants' Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity and location. This process enables Defendants to monetize their Website. To achieve this, Microsoft

---

[29] *Microsoft Invest*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp#accordionb751e6297a-item-73282c0a03 (last visited Dec. 23, 2024).

uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendants' Website.

75.    The first time a user visits the Websites, the user's browser sends an HTTP request to Defendants' server, and Defendants' server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records through its Tracker—as the below screenshot from Plaintiff Maketa's browser on the Screenrant Website indicates (relevant portions highlighted in red boxes).[30]

**Figure 4:**



---

[30] All but the first three numbers of Plaintiffs' IP addresses are redacted throughout this Complaint to protect their privacy.

76. The same process occurs on the Polygon Website, as the below screenshot of traffic from Plaintiff Peppers' browser indicates (relevant portions highlighted in red boxes):

**Figure 5:**



77. Moreover, Microsoft stores a cookie (the unique identifier, "UUID2" in Figures 4-5 above) with the user's IP address and Device Metadata in the user's browser cache. The UUID2 "records information that helps differentiate between devices and browsers. This information is used to pick out ads delivered by the platform and assess the ad performance and its attribute payment."[31]

78. If the cookie is stored on the browser, the ADNXS Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to Microsoft. A general diagram of this process is pictured 6 below, which explains how the Websites—as programmed by Defendants—cause the ADNXS Tracker to install a cookie on the user's browser and instruct the

---

[31] ATFX, COOKIES POLICY, https://www.atfxconnect.com/en/cookies-policy/.

1    user's browser to send the user's IP address and Device Metadata along with the unique identifier

2    value to Microsoft.

3    **Figure 6:**



11    79.    If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from

12    its cache. Accordingly, the next time the user visits Defendants' Websites, the process begins over

13    again: (i) Defendants' server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS

14    Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the

15    ADNXS Tracker stores a cookie in the browser cache, and (iv) Microsoft will continue to receive

16    the user's IP address and Device Metadata on subsequent visits to the Websites along with the unique

17    user identifier.

18    80.    In all cases, however, Microsoft receives a user's IP address, Device Metadata, and

19    unique user identifier every time its Tracker is loaded by the Websites, as the above screenshots

20    indicate.

21    81.    Using the IP addresses, Device Metadata, and "UUID2" unique identifier, Microsoft

22    can track and identify Website users across the Internet.

23    82.    The ADNXS Tracker will also share the user's UUID2 value with many of the Linked

24    Data Brokers on the Websites. The explicit purpose of this process—which is called "cookie

25    syncing" and is alleged in more detail below—is to identify the user by matching that user with any

26    profiles Microsoft and/or these other third parties may have on the user, which are then provided by

27    Microsoft for sale to advertisers. All of this enriches Defendants, who derives a greater profit from

28

having its users de-anonymized and identified and sold for more money based on the greater amount of information available about them.

(i)    **Experian/Tapad**

83.    For example, Microsoft syncs its UUID2 with the Tapad tracker, whose tracker Defendant installs on users of the Websites.    As the below screenshot from Plaintiff Maketa's browser on the Screenrant Website indicates, the value of the "partner_device_id" parameter matches the value of the UUID2 parameter in Figure 4.    Indeed, the "partner_id" is even identified to be "APPNEXUS."    Tapad is also enhancing the information Microsoft knows about Plaintiff with information that Tapad knows about Plaintiff, something indicated by the path of the GET request, "idsync."    Finally, Tapad is installing its own cookies on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 7:**



84.    The same is true of the Polygon Website, as the below screenshot from Plaintiff Peppers' browser indicates.    The value of the "partner_device_id" parameter matches the value of the UUID2 parameter in Figure 5.

**Figure 8:**

85.     Tapad is a registered data broker in California[32] and is owned by Experian,[33] another registered data broker in California.[34]  The purpose of the Tapad Pixel—which is owned and operated by these entities and used is in conjunction with Experian's services—is to perform identity resolution.  As Experian describes it:

> [i]dentity resolution matches fragmented identifiers to a single profile. This creates a unified, cross-channel view of a consumer that helps marketers understand a customer's demographics, lifestyle, interests, and where and how they engage with your brand.  Identity resolution improves campaign targeting and enables marketers to deliver personalized marketing messages.[35]

86.     Tapad identifies users by "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi connections, website registrations, browsing history and other inputs."[36]  Tapad then aggregated these inputs into what it called a "Device Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[37]

87.     Tapad integrates with Experian's "offline consumer data set (purchase behaviors, interests, lifestyle info)."[38]  This includes "first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information."[39]  And as Experian advertisers, its identity graph is composed of "[o]ver 250M individuals and 126 million households," enabling its partners like Microsoft to "known and anonymous IDs and data back to a single person or household to resolve identity."[40]

---

[32] DATA BROKER REGISTRATION FOR TAPAD, INC., https://oag.ca.gov/data-broker/registration/187511.

[33] Allison Schiff, *Telenor Sells Tapad to Experian for $280 Million*, ADEXCHANGER (Nov. 19, 2020), https://www.adexchanger.com/privacy/telenor-sells-Tapad-to-experian-for-280-million/.

[34] DATA BROKER REGISTRATION FOR EXPERIAN INFORMATION SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186691.

[35] https://www.experian.com/marketing/consumer-sync/identity-resolution.

[36] *Id.*

[37] https://techcrunch.com/2016/02/01/telenor-jumps-into-ad-tech-acquires-Tapad-for-360m/.

[38] *Id.*

[39] *Id.* (cleaned up).

[40] GRAPH | EXPERIAN'S IDENTITY GRAPH, https://www.experian.com/marketing/consumer-sync/identity-resolution/identity-graph.

**Figure 9:**



88.     Thus, when Microsoft partners with advertisers to bid on Website users—as is the ADNXS Tracker's function as a demand-side platform—advertisers can better identify and target their bids as a result of the ADNXS Tracker syncing with Tapad's tracker, which de-anonymizes and identifies users.  Tapad and Experian, in turn, build on their already expansive database through this transaction.  And Defendant profits from installing both trackers on its Websites because its users can be sold to advertisers for more money, thus enriching Defendant.

### (ii)     PubMatic

89.     As another example, Microsoft syncs the UUID2 with Pubmatic, another registered data broker in California,[41] whose tracker Defendant installs on users of the Websites.  As pictured in the below screenshot from Plaintiff Maketa's browser on the Screenrant Website, the value of the "KRTBCOOKIE_57" parameter matches the value of the UUID2 parameter in Figure 4 above.  This allows Microsoft to obtain whatever information PubMatic has on the user (and vice versa).  Indeed, PubMatic admits that the KRTBCOOKIEs are used "to correlate our user IDs with those of our partners (such as demand side platform clients or other advertising technology companies).  We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements.  This enables the partner to make better decisions about whether to display an advertisement to you."[42]  PubMatic also sets a KADUSERCOOKIE on the user's browser (which

---

[41] DATA BROKER REGISTRATION FOR PUBMATIC. INC., https://oag.ca.gov/data-broker/registration/186702.

[42] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/.

is likewise syncing with the ADNXS Tracker), which is used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[43]

**Figure 10:**



90.     The same is true of the Polygon Website, as the below screenshot from Plaintiff Peppers' browser indicates.   The value of the "KRTBCOOKIE_57" parameter matches the value of the UUID2 parameter in Figure 5.

**Figure 11:**



91.     PubMatic describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[44]

---

[43] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, https://pubmatic.com/legal/platform-cookie-policy/

[44] *The Supply Chain Of The Future*, PubMatic, https://pubmatic.com/about-us (last accessed Feb. 18, 2025).

92.     Specifically, PubMatic is a "supply side platform" that helps website operators like Defendants "[m]aximize advertising revenue and control how your audiences are accessed."[45]  As explained it more detail below, this makes it apparent that PubMatic (a supply-side platform) would sync its user information with Microsoft (who is operating a demand-side platform here), as PubMatic is trying to sell Defendant's users to advertisers, and Microsoft here is trying to solicit bids from advertisers on Defendant's users.

93.     To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[46]

94.     Likewise, PubMatic provides identity resolution the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[47]  This allows website operators like Defendants to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[48]

95.     Notably, PubMatic also touts its ability to integrate with multiple other third parties— including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance."[49]

//

//

//

//

//

//

---

[45] *The Digital Advertising Supply Chain of the Future. Delivered.* PubMatic SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[46] *Id.*

[47] IDENTITY MANAGEMENT.  DELIVERED, PUBMATIC, https://pubmatic.com/products/identity-hub/.

[48] *Id.*

[49] THE PROGRAMMATIC FUTURE.  DELIVERED, PUBMATIC, https://pubmatic.com/products/pubmatic-ssp-for-buyers/.

**Figure 12:**



96.    Indeed, PubMatic enables website operators like Defendants to sell their users to advertisers with a variety of characteristics, including geography.[50]

97.    PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[51]  One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[52]  In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

98.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[53]  This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer

---

[50] *Id.* (image under "Greater Efficiency" listed "geography" as a targeting attribute).

[51] CONNECT WITH PUBMATIC'S AUCTION PACKAGES, PUBMATIC, https://pubmatic.com/auction-packages.

[52] RAMADAN AUCTION PACKAGE: UNITED STATES, PUBMATIC, https://pubmatic.com/auction-packages/us/ramadan-us/.

[53] *Id.*

& Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[54]

99.    Thus, when Microsoft partners with advertisers to bid on Website users—as is the ADNXS Tracker's function as a demand-side platform—advertisers can better identify and target their bids as a result of the ADNXS Tracker syncing with PubMatic's tracker, which de-anonymizes and identifies users.  PubMatic, in turn, builds on its already expansive database through this transaction.  And Defendant profits from installing both trackers on its Websites because its users can be sold to advertisers for more money, thus enriching Defendant.

### (iii)    LiveRamp (Screenrant Website)

100.    As a final example, Microsoft syncs with the RLCDN tracker, which Defendant installs on the browsers of users of the the Screenrant Website, which is owned and operated by LiveRamp, another registered data broker in California.[55]

101.    Again, the ADNXS Tracker syncs its UUID2 with LiveRamp, as the below screenshot from Plaintiff Maketa's browser indicates.  The value of the "partner_uid" parameter matches the value of the UUID2 parameter in Figure 4.  Indeed, the "idsync.rlcdn.com" value leaves little doubt that Microsoft is matching its unique identifiers with the RLCDN tracker to obtain any information LiveRamp has about the user.

**Figure 13:**



---

[54] *Id.*

[55] DATA BROKER REGISTRATION FOR LIVERAMP, INC., https://oag.ca.gov/data-broker/registration/560496.

102.    LiveRamp provides "identity resolution," which "[b]ring in data from across identity spaces" "to enable the delivery of more personali[z]ed and meaningful customer experiences."[56] LiveRamp claims to "maintain[] the largest and most accurate people-based identity graph on the market."[57]  Its identity graph has PII or personally identified information "on 245 million individuals in the U.S."[58]

103.    LiveRamp does this through its "LiveRamp Identity Graph," which "is a people-based map connecting de-identified offline touchpoints and online devices" that (i) "[r]esolv[es] separate emails, postal addresses, and phone numbers to a single individual"; (ii) "[m]atch[es] disparate devices to people-based pseudonymous identifiers"; and (iii) "[m]erg[es] these offline and online identity spaces into a unified … people-based ID space."[59]

104.    LiveRamp collects individuals' "PII touchpoints" or personally identifiable information such as their "email [addresses], name[s] and postal [addresses], [and] phone [numbers]."[60]  "[I]deally LiveRamp will always have all PII touchpoints merged for an individual, but our algorithms will only merge this data when we are extremely confident they are tied to the same individual."[61]

//

//

//

//

//

//

---

[56] IDENTITY RESOLUTION, LIVERAMP, https://liveramp.uk/identity-resolution/.

[57] INTERPRETING RAMPID, LIVERAMP'S PEOPLE BASED IDENTIFIER, LIVERAMP, https://tinyurl.com/jpmtx3ut.

[58] Id.

[59] RAMPID METHODOLOGY, https://docs.liveramp.com/identity/en/rampid-methodology.html

[60] INTERPRETING RAMPID, LIVERAMP'S PEOPLE-BASED IDENTIFIER, https://tinyurl.com/jpmtx3ut.

[61] Id.

**Figure 14:**



105.    For that reason, LiveRamp sets a RampID on the user's browser, which "enables real-time people-based insights" to be attached to each visitor.[62]   LiveRamp does this by taking a company's first-party data, and seamlessly matching it to RampID, LiveRamp's "people-based identity graph."[63]

106.    Thus, when Microsoft partners with advertisers to bid on Website users—as is the ADNXS Tracker's function as a demand-side platform—advertisers can better identify and target their bids as a result of the ADNXS Tracker syncing with LiveRamp's tracker, which de-anonymizes and identifies users.   LiveRamp, in turn, builds on its already expansive database through this transaction.  And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

*        *        *

107.    This is a non-exhaustive list of the Linked Data Brokers with whom Microsoft syncs its ADNXS Tracker on the Websites.  Suffice it to say, Microsoft is syncing its ADNXS Tracker with registered data brokers and data sellers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes and to enrich Defendants without users' consent.

---

[62] *Id*.

[63] *Id*.

108.    The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 684 F. Supp. 3d at 1050.

109.    Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *See*, *e.g.*, *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 952 (N.D. Cal. 2023).

110.    Because the ADNXS Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

111.    The ADNXS Tracker is also a "pen register" because its "UUID2" is used to ascertain the identity of the user communicating with the Website and thus constitutes "addressing" information.  *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

### 2.    The OpenX Tracker And The Data Brokers It Syncs With

112.    OpenX is a registered data broker in California[64] that develops and operates the OpenX Tracker, sometimes called "OpenAudience," which it provides to website owners like Defendants for a fee.

113.    OpenX helps companies, like Defendants "utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[65]

114.    OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[66]

---

[64] *Data Broker Registration for OpenX Technologies, Inc*., OFFICE OF THE ATTORNEY GENERAL, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

[65] *OpenAudience*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Jan. 27, 2025).  First-party data is data that websites "collect directly from [their] customers," while third-party data is data that is "acquire[d] from a data aggregator" that does "not collect data directly but obtain[s] it from other companies and compile[s] it into a single dataset."  WHAT IS THE DIFFERENCE BETWEEN FIRST-PARTY, SECOND-PARTY AND THIRD-PARTY DATA?, CUSTOMER DATA PLATFORM RESOURCE, https://tinyurl.com/2htc6a8n.

[66] *Data Activation*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Feb. 3, 2025).

115.    In other words, OpenX compiles comprehensive user profiles by tracking users across the Internet.  OpenX then augments the information of its client's end users (like Defendants' end users) with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving Defendants' revenue.  To achieve this, OpenX uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors to Defendants' Website.

116.    The first time a user visits Defendants' Screenrant Website, the user's browser sends an HTTP request to Defendants' server, and Defendants' server sends an HTTP response with directions to install the OpenX Tracker on the user's browser.  The OpenX Tracker, in turn, instructs the user's browser to send OpenX the user's IP address and Device Metadata—which OpenX records through its Tracker—as the below screenshot from Plaintiff Maketa's browser on the Screenrant Website indicates (relevant portions highlighted in red boxes).

**Figure 15:**

117.    The same process occurs on the Polygon Website, as the below screenshot of traffic from Plaintiff Peppers' browser indicates (relevant portions highlighted in red boxes):

**Figure 16:**



118.    Moreover, OpenX stores a cookie (the "i=" parameter in Figures 9-10 above) with the user's IP address and Device Metadata in the user's browser cache. This "market cookie" is "used for OpenX's device recognition."[67]  When the user subsequently visits Defendants' Websites, the OpenX Tracker locates the cookie identifier stored on the user's browser.

119.    If the cookie is stored on the browser, the OpenX Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to OpenX.  A general diagram of this process is pictured as Figure 6, which explains how the Websites—as programmed by

---

[67] OPENX AD EXCHANGE PRIVACY POLICY, https://www.openx.com/privacy-center/ad-exchange-privacy-policy/#section-8

Defendants—cause the OpenX Tracker to install a cookie on the user's browser and instruct the user's browser to send the user's IP address and Device Metadata along with the unique identifier value to OpenX.

120.     If the user clears his or her cookies, then the user wipes out the OpenX Tracker from its cache.  Accordingly, the next time the user visits Defendants' Websites, the process begins over again: (i) Defendants' server installs the OpenX Tracker on the user's browser, (ii) the OpenX Tracker instructs the browser to send OpenX the user's IP address and Device Metadata, (iii) the OpenX Tracker stores a cookie in the browser cache, and (iv) OpenX will continue to receive the user's IP address and Device Metadata on subsequent visits to the Websites along with the unique user identifier.

121.     In all cases, however, OpenX receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Websites, as the above screenshots indicate.

122.     The OpenX Tracker also syncs with many of the Linked Data Brokers on the Websites.  The explicit purpose of this process is to identify the user by matching that user with any profiles OpenX and/or these other third parties may have on the user, which are then provided by for sale to advertisers.  All of this enriches Defendants, who derives a greater profit from having its users de-anonymized and identified and sold for more money based on the greater amount of information available about them.

(i)     **Epsilon/Lotame**

123.     For example, and as the below screenshots from Plaintiffs' browsers indicate, OpenX syncs with the Crowd Control Tracker, which Defendants install on the browsers of visitors to both Websites.  *See* Figure 17 (Plaintiff Maketa on the Screenrant Website); Figure 18 (Plaintiff Peppers on the Polygon Website).

//

//

//

**Figure 17:**



**Figure 18:**

124.    Lotame, a registered data broker in California.[68]  In March 2025, Lotame was acquired by Epsilon,[69] another data broker.[70]

125.    Lotame claims to operate a "Data Management Platform" or "DMP."  A Data Management Platform is a sophisticated technology tool used in the field of advertising (AdTech) and marketing (MarTech) to collect, analyze, and leverage data for better audience targeting and campaign optimization.  It serves as a centralized data hub that consolidates and organizes vast amounts of user information from various sources."[71]

---

[68] DATA BROKER REGISTRATION FOR LOTAME SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186954.

[69] Epsilon, *Publicis To Acquire Lotame The World's Leading Independent End-To-End Data Solution* (Mar. 6, 2025), https://www.epsilon.com/us/about-us/pressroom/lotame-acquisition.

[70] DATA BROKER REGISTRATION FOR EPSILON MANAGEMENT, LLC, https://oag.ca.gov/data-broker/registration/186453.

[71] Saurav Das, *Data-Management-Platform (DMP) – Simplified?*, MEDIUM (June 17, 2023), https://medium.com/@101writer/what-is-dmp-d9aa6fcfe057.

126.    "At its core, a DMP collects first-party, second-party, and third-party data … Once the data is collected, the DMP employs advanced algorithms and machine learning techniques to analyze and segment the audience. It helps marketers understand their customers' behaviors, preferences, and interests, enabling them to create more personalized and targeted marketing campaigns."[72]

127.    "By leveraging a DMP, marketers can deliver more personalized and relevant experiences to their target audience, resulting in higher engagement and conversion rates.  They can optimize their advertising spend, minimize wastage, and achieve better marketing outcomes."[73]

128.    Lotame takes first party data and uses it to match a company's audience against Lotame's comprehensive user profiles.  That is, Lotame analyzes a company's first party data  "for traits that your customers have in common and build[s] out that initial audience using Lotame's lookalike modeling capabilities to include new customers who also have those characteristics," making that information more valuable to advertisers, thereby driving Defendant's revenue.[74]

129.    Lotame offers such advertisers the ability to "[e]xpand and enrich your target audiences with scalable, trusted partner data" sources via their exclusive partnerships.[75]   In other words, Lotame compiles comprehensive user profiles by tracking users across the Internet so customers like Defendant can "get maximum value from your first-party data" to "drive audience growth" and target advertising campaigns to boost revenue.[76]

130.    "Audience targeting involves breaking down consumers into specific segments based on the data you've collected about them and their behavior, such as their interests, demographics and

---

[72] *Id.*

[73] *Id.*

[74] Alexandra Theriault, *First-Party Data vs Third-Party Data: How To Use Them*, LOTAME (Nov. 21, 2024), https://www.lotame.com/resources/1st-party-2nd-party-3rd-party-data-what-does-it-all-mean/.

[75] *Data Informed Audiences*, LOTAME, https://web.archive.org/web/20250115002619/https://spherical.lotame.com/data-informed-audiences/ (as accessed Jan. 15, 2025).

[76] *Id.*

buying history.  Then, you'll use that information to tailor your marketing messages directly to that segment for more powerful engagement and, ideally, greater conversions."[77]

131.    Lotame does this through its proprietary identity resolution tool called the "Panorama Graph."  The "Lotame Panorama Graph, our patented identity resolution engine, consists of a variety of signals including email, cookies, and device IDs as well as machine learning models to uniquely deliver both accuracy and scale.  It unlocks addressability to 1.3 billion users with global coverage.  Find your people around the world and make meaningful, respectful connections that last."[78]

132.    Lotame can then use these individual profiles to provide marketers, such as Defendant, "with fresher, more relevant and addressable audiences" which "translates into better 1:1 targeting and personalization."[79]  Indeed, Lotame admits that "[i]dentity resolution and activation help marketers identify unique users across various channels and devices in order to deliver personalized advertising messages that drive outcomes."[80]

133.    "Lotame Panorama ID is a global pseudonymous identifier that represents a single consumer view across channels.  Built from multiple inputs, our publisher-adopted ID resolves a variety of user signals, such as email and digital data from web, mobile, and CTV.  Unlike other identifiers, Panorama ID is proven to ensure data-driven audience activation works in cookie and cookie-restricted environments."[81]  Indeed, "Panorama Graph connects and unifies consumer digital touch points across emails, cookies, and device IDs to offer a single view of a user."[82]

//

//

//

//

---

[77] Danielle Smith, *How Does Audience Targeting Work?* Lᴏᴛᴀᴍᴇ (July 24, 2024), https://www.lotame.com/resources/finding-target-audience/.

[78] *Panorama Graph*, Lᴏᴛᴀᴍᴇ, https://tinyurl.com/5byy9tns (as accessed Feb. 13, 2025).

[79] *Id.*

[80] *Id.*

[81] *Lotame Panorama ID*, Lᴏᴛᴀᴍᴇ, https://tinyurl.com/zhav4j2w (as accessed Mar. 24, 2025).

[82] *Lotame Panorama Identity*, Lᴏᴛᴀᴍᴇ, https://tinyurl.com/y2bm9xyf (as accessed Jan. 2, 2025).

**Figure 19:**



134.    Lotame touts that as a result of these efforts, "Lotame's data collaboration solutions help data sellers maximize the value of your rich online and offline datasets."[83]

135.    Thus, by installing the trackers of two massive data brokers, Defendants' users are thoroughly de-anonymized and identified, and linked to replete repositories of user information that are offered up for sale to advertisers.  OpenX and Lotame (and Epsilon) each build on their already thorough profile of users.  And Defendant is enriched by installing and using both trackers because its users are linked to comprehensive profiles that command more value from advertisers.

(ii)    **Magnite**

136.    As another example, and as the below screenshots from Plaintiffs' browsers indicate, OpenX syncs with the Rubicon tracker, which Defendants install on the browsers of visitors to both Websites.  *See* Figure 20 (Plaintiff Maketa on the Screenrant Website); Figure 21 (Plaintiff Peppers on the Polygon Website).

//

//

//

//

---

[83] *Data Sellers*, LOTAME, https://tinyurl.com/yfzwwnmx (as accessed Jan. 2, 2025).

1

**Figure 20:**



**Figure 21:**

137.    The Rubicon tracker is owned and operated by Magnite, who is another registered data broker in California.[84]

138.    Magnite is another supply-side platform that companies like Defendants use "to monetize their content," and "[t]he world's leading agencies and brands trust [Magnite's] platform to access … billions of advertising transactions each month."[85]

---

[84] DATA BROKER REGISTRATION FOR MAGNITE INC., https://oag.ca.gov/data-broker/registration/568127.

[85] *iHeartMedia and Magnite Unify Access to Broadcast and Digital Audio, Providing Advertisers with a Direct Path to Premium Inventory*, MAGNITE (Jan. 9, 2024), https://investor.magnite.com/news-releases/news-release-details/iheartmedia-and-magnite-unify-access-broadcast-and-digital-audio.

139.    It is estimated that Magnite collects information on a billion website interactions.  "By leveraging [their] platform, [Magnite] believe[s] buyers can reach approximately one billion internet users globally, including through many of the world's largest and most premium sellers."[86]

140.    Magnite calls its suite of identity resolution products the Magnite Access Suite.[87]

141.    Magnite's suite includes four products: Magnite DMP; Magnite Storefront; Magnite Match; and Magnite Audiences.[88]

142.    Magnite DMP helps publishers sell their first-party data.  It "enables sellers to seamlessly create, [audience] segment[s]" so they can make their data more valuable to buyers.[89]

143.    Magnite Storefront "enables the activation of buyer and seller first-party data on the sell side and facilitates the buying and selling of third-party data–from discovery to activation–across all of Magnite's platforms."[90]

144.    Magnite Match is "a cloud-based solution that allows sellers and buyers to establish a match between data sets" so that a publisher's first-party data can be merged and enhanced with other data about the same individual.[91]

145.    Magnite Audiences are "cross-publisher segments that Magnite packages to make it easier and more efficient for buyers to reach high value audiences at scale."[92]  In other words, Magnite takes a publisher's first-party data and combines it with first-party data from other publishers where the individuals have similar interests based on their web activity, which "generates a potential new revenue stream for publishers with no additional operational overhead."[93]

---

[86] MAGNITE FORM 10-K, at 9 (2016), https://investor.magnite.com/static-files/88921618-9e64-4b6b-9bb1-ef1422015f44.

[87] *Introducing Magnite Access: An Omnichannel Audience, Data and Identity Suite*, MAGNITE (June 15, 2023), https://www.magnite.com/press/introducing-magnite-access-an-omnichannel-audience-data-and-identity-suite/.

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

146.    The upshot of all this is that Magnite enables website operators like Defendants to effectively sell their user inventory to advertisers in a de-anonymized, targeted format.  By syncing its tracker with OpenX's, Magnite facilities this goal, leveraging OpenX's replete database of user profiles (described in more detail below) to de-anonymize and identify users of websites such as users of the Websites.

147.    Thus, when Magnite offers Website users up for sale to advertisers—as is Magnite's function as a supply-side platform—those users will receive higher bids because they can be better targeted by advertisers as a result of Magnite's synchronization with OpenX's Tracker.  OpenX, in turn, builds on its already expansive database by learning whatever Magnite knows about the user. And Defendants are enriched because their users now command a higher value as a result of Defendants' installation and use of both trackers.

*        *        *

148.    This is a non-exhaustive list of the Linked Data Brokers with whom OpenX syncs its Tracker on the Websites.  Suffice it to say, OpenX is syncing its OpenX Tracker with Linked Data Brokers to build on and provide its expansive profiles of users for sale to advertisers, all of which is used for advertising purposes and to enrich Defendants without users' consent.

149.    The OpenX Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

150.    Further, the OpenX Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 952.

151.    Because the OpenX Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

152.    The OpenX Tracker is also a "pen register" because it is used to ascertain the identity of the user communicating with the Website and thus constitutes "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

III.   **DEFENDANTS' CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY**

153.   The collection of Plaintiffs' and Class Members' personally identifying non-anonymized information by the Third Parties through Defendants' installation and use of the Trackers constitutes an invasion of privacy.

154.   As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendants' revenue, all through their surreptitious collection of Plaintiffs' and Class Members' personal information.

155.   To put the invasiveness of Defendants' violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

156.   In short, the import of these concepts is that: (i) the Third Parties are data brokers or sync with the Linked Data Brokers to uniquely identify and de-anonymize Websites users by matching users' their IP addresses, Device Metadata, and unique ID values with comprehensive profiles held by the Linked Data Brokers; (ii) the Third Parties share that information amongst one another and with other entities like the Linked Data Brokers to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendants, the Third Parties, and the Linked Data Brokers and to the detriment of users' privacy interests.

A.   **Data Brokers and Real-Time Bidding: The Information Economy**

   1.   *Data Brokers*

157.   While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[94] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

---

[94] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

158.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which OpenX and the Linked Data Brokers each do.

159.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers.  An identity graph is used for real-time personalization and advertising targeting for millions of users."[95]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

160.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[96]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[97]

161.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[98]

---

[95] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[96] SHERMAN, *supra*, at 2.

[97] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[98] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

162.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[99]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[100]

163.    This data collection has grave implications for Americans' right to privacy.    For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[101]

164.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further

---

[99] SHERMAN, *supra*, at 1.

[100] *Id*.

[101] *Id.* at 9.

driving up costs of goods and services (from insurance to housing) for minority groups.[102]

165.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[103]

**Figure 22:**



166.    In the modern age, these threats are far too real.  For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or

---

[102] *Id.*

[103] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

other personal details from online data broker services, according to court documents."[104]  Similarly,

following the protests in Los Angeles this past summer:

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements that's collected and sold by everything from weather apps to data brokers.[105]

167.    Of course, data brokers do not just track people for no reason; they do so because they

have their trackers installed on users' browsers and are paid by website operators by Defendants to

do so.  So, by installing the trackers of data brokers on users' browsers, Defendants are causing and

putting its users in the crosshairs of the privacy harms noted above.

168.    In addition, as noted above, data brokers like OpenX and the Linked Data Brokers are

able to compile such wide swaths of information in part by collecting users' IP addresses and Device

Metadata, which is used by data brokers to track users across the Internet.[106]

169.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place

trackers or cookies on your browsers … [that] track your IP address and browsing history, which

third parties can exploit."[107]

170.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other

---

[104] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

[105] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, POLITICO (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-trump-00400127

[106] *Id.* at 11.

[107] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

people like you, so they can sell those lists of like-people and generate their income.[108]

171.    In short, by collecting IP addresses and Device Metadata, data brokers like OpenX and the Linked Data Brokers can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

172.    As a result of Defendants' installation of the tracker of data broker OpenX and the Linked Data Brokers, Plaintiffs' and Class Members' information is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiffs and Class Members).  These profiles are then served up to any companies that want to advertise on Defendants' Websites, and Defendants' users become more valuable because of having their IP addresses and Device Metadata used to link users to these data broker profiles.

173.    Thus, Defendants are unjustly enriched through advertising revenue by installing the Trackers on Plaintiffs' and Class Members' browsers without consent.

            2.      *Real-Time Bidding*

174.    So, once data brokers collect Website's users' IP addresses and Device Metadata and create or link that information to comprehensive user profiles, how do these data brokers "sell" or otherwise help Defendants monetize that information?  This is where real-time bidding—and the Third Parties' Trackers—comes in.

175.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[109]

176.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP, which is

---

[108] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[109] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

at least one function of the OpenX Tracker,[110] "work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the ADNXS Tracker is[111]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[112] And an Advertising Exchange—which OpenX also provides[113]—"allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[114]

177. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

178. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs . The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[115]

---

[110] See, e.g., OPENX, https://www.openx.com/ (describing itself as the "Most Innovative Independent Supply-Side Platform").

[111] MICROSOFT INVEST, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[112] Geoghegan, *supra*.

[113] *Introducing To Ad Serving*, Microsoft Ignite (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving ("Major ad exchanges include … OpenX").

[114] *Id*.

[115] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 23:**



179.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendants' users to procure the greatest interest from advertisers and solicit the highest bids.  These entities receive assistance because Defendants also installs the trackers of OpenX (who is a data broker itself) and the Linked Data Brokers, on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP [or SSP] enlists a final actor, the data management platform (DMP) [or data brokers].  DSPs send bid requests to DMPs [or data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[116]

**Figure 24:**



---

[116] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

180.   In other words, SSPs are able to solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information OpenX and the Linked Data Brokers know about that user.  If there is a match, then the SSP will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

181.   Likewise, a DSP can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with the Linked Data Brokers.

182.   All of this naturally enriches Defendants, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

183.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    (i)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendants] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    (ii)    "send[ing] sensitive data across geographic borders."

    (iii)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[117]

184.   Given Microsoft operates as a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses the Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement.  This greatly diminishes the ability of users to control their personal information.

---

[117] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

185.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[118]

186.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[119]:

**Figure 25:**



187.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas*, 38 Cal. 3d at 361 (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

---

[118] Geoghegan, *supra*.

[119] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

3.    *Cookie Syncing*

188.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendants install their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).  The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

189.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[120] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[121]

190.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com.

---

[120] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: The World Wide Web Conference 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[121] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC Conference on Computer and Communications Security 674, 674 (2014)

*To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[122]

**Figure 26:**



191.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[123]

192.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[124]    "[W]hen a user erases her browser state and restarts browsing, trackers usually place

---

[122] Papadopoulos, *supra*, at 1433.

[123] Papadopoulos, *supra*, at 1434.

[124] *Id.*

and sync a new set of userIDs, and eventually reconstruct a new browsing history."[125]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[126]

193.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[127]

194.    Cookie syncing is precisely what is happening here.  When the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with the Linked Data Brokers whose trackers Defendants also install and use on the Websites.  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from actually being anonymous when they visit the Websites.

*       *       *

195.    To summarize the proceeding allegations, OpenX is a data broker that focuses on collecting as much information about Website users as possible to create comprehensive user profiles, and Microsoft syncs with the Linked Data Brokers that do the same.  The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources (*e.g.*, the Linked Data Brokers or the profiles OpenX itself maintains) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interest advertisers through real-time bidding using the Third Parties' Trackers, where users will command more value the more advertisers know about a user.

---

[125] *See id.*

[126] *Id.*

[127] *Id.* at 1441.

196.    Thus, the Third Parties enrich the value Defendants' users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique IDs) with comprehensive user profiles.

197.    Accordingly, Defendants are using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Websites by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

198.    Thus, Defendants are unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiffs' and Class Members' consent, and that enable the Third Parties to sell Defendants' user inventory in an ad-buying system. In addition, Plaintiffs and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

**B.    Defendants Use The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

199.    Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers looking to invest in upper funnel buying and drive business results."[128]

200.    Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[129]

201.    In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.

---

[128] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 23, 2024).

[129] *Id.*

…

Once we get the call, we overlay segment data from our server-side cookie store. Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data. We also contact third-party data providers and overlay any available data. [130]

We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.

…

The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad. [130]

202.    Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[131]  To do this, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[132]

203.    Microsoft also integrates with the Linked Data Brokers (and thus, the other entities those Linked Data Brokers sync with) on Defendants' Websites to enrich Defendants' user data and therefore obtain higher bids to show advertisements to Defendants' users.  And Microsoft discloses all this information to advertisers that bid on Defendants' users, regardless of whether the advertiser wins the bid.

204.    Further, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data.  [They] also contact third-party data providers and overlay any available data."[133]

---

[130] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[131] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest

[132] *Id.*

[133] *Id.*

205.   In other words, when users visit Defendants' Website, Microsoft collects users' IP addresses and Device Metadata through its ADNXS Tracker to provide to advertisers interested in showing an advertisement to Defendants' Website users, enriching that information by integrating with the Linked Data Brokers, among others, and ultimately enabling Defendants to monetize its Website and maximize revenue by collecting and disclosing user information.

**C.    Defendants Use The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

206.   As noted above, OpenX is a registered Data Broker in California.[134]  It claims to be "the world's leading independent supply-side platform (SSP) for audience, data, and identity targeting."[135] OpenX also provides an advertising exchange, as alleged above.

207.   OpenX's "proprietary identity resolution tool, OpenAudience, uses state-of-the-art data and identity technology to allow marketers to reach their target audiences and segments — connecting [companies] to [their] desired consumers in more ways than you have ever imagined possible."[136]

208.   OpenX does this by taking a company's "first-party data, or any pre-built audience segments, and seamlessly match[ing it] to [OpenX's] identity graph of more than 200 million unique people."[137]

209.   In other words, OpenAudience gathers information of Defendants' Screenrant Website's users, such as IP addresses and Device Metadata, compares it against their own records, and combines the two to enhance the information into a deanonymized profile of each individual website visitor.

210.   OpenX can then use these individual profiles to provide marketers, such as Defendants, with curated packages that identify and target specific customers.[138]

---

[134] *About Us*, OPENX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

[135] *Id.*

[136] *Buyers*, OPENX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

[137] *OpenAudience*, OPENX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

[138] *Curated Packages*, OPENX, https://www.openx.com/curated-packages/ (last accessed Feb. 4, 2025).

211.    OpenX splits this up into two different types of packages.  The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers *wherever* and *whenever* they engage with their favorite content."[139]  The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory. [Allowing companies, like Defendants to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[140]

212.    This identity graph provides companies, like Defendants and the other Third Parties, access to 800 million hashed emails, 200 million hashed phone numbers, over 200 million U.S. users instrumented for data and identity, 48 million CTV users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 data attributes available for targeting.[141]

**Figure 27:**




**Match**
Integrate your first-party data, or any pre-built audience segments, and seamlessly match to our identity graph of more than 200 million unique people.

**Enrich**
Make your data more useful with more than 3,000+ sortable fields, including consumer habits, lifestyle, spend, and more. Refine your data and get more granular, or expand your audience and create look-alikes.

**Activate**
Data and audience segments are useful only if you can run campaigns against them. We'll give you a simple Deal ID that you can use with the DSP of your choice to reach your audiences across our premium supply.

213.    In other words, OpenX utilizes third-party data (*i.e.*, data OpenX collects on its own), as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party, like data directly from users of Defendants' Websites), to determine where to place advertisers' ads and who to place them in front of.

---

[139] *Id.* (emphasis added).

[140] *Id.*

[141] *OpenAudience*, OPENX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

214.    By way of example, OpenX sells a "Health Insurance Data Driven Package" that targets consumers who have viewed advertisements from health insurance advertisers.[142]  This helps companies target people who have indicated an interest in specific health insurance related content.

215.    To do all of this, OpenX needs to collect data that identifies a particular user.  This is why OpenX collects IP addresses and Device Metadata: it allows OpenX to link one of Defendants' Website users to any profile OpenX may have about that user, and OpenX can in turn provide that profile to interested advertisers for more targeted advertising.  The IP address, Device Metadata, and unique user identifier, also allow OpenX to track a user's Website activity over time (*i.e.*, through repeated Website visits) and to track that user on other websites.

216.    In other words, when users visit Defendants' Website, OpenX collects users' IP addresses and Device Metadata through its Tracker to build comprehensive user profiles, which are used to identify Defendants' users, enrich Defendants' user data, and make those users more valuable to prospective advertisers by allowing advertisers to target specific users better.  All of this helps Defendants further monetize its Websites and maximize revenue by collecting and disclosing user information.

217.    OpenX has previously been sued by the federal government for collecting personally identifiable information from users who specifically asked not to be tracked.  *See United States of America v. OpenX Technologies, Inc.* Case No. 2:21-cv-09693-DMG-AGR (C.D. Cal.).[143]

## IV.    PLAINTIFFS' EXPERIENCES

### A.    Plaintiff Maketa

218.    Plaintiff Maketa has regularly visited the Screenrant Website on her desktop browser during the class period, as long ago as 2018 and as recently as April 2025.

219.    When Plaintiff Maketa visited the Screenrant Website, the Screenrant Website's code—as programmed by Defendants—caused the Third Parties' Trackers to be installed on Plaintiff

---

[142]   *Health Insurance Data Driven Package*, OPENX, https://www.openx.com/curated-packages/health-insurance/ (last accessed Feb. 04, 2025).

[143]   ADVERTISING PLATFORM OPENX WILL PAY $2 MILLION FOR COLLECTING PERSONAL INFORMATION FROM CHILDREN IN VIOLATION OF CHILDREN'S PRIVACY LAW, https://tinyurl.com/yp3f2nm5.

Maketa's browser. *See* Figures 4, 15, *supra*. Defendants also caused the Linked Data Brokers' trackers to be installed on Plaintiff Maketa's browser. *See* Figures 7, 10, 13, 17, 20, *supra*.

220. Through their respective Trackers, the Third Parties collected Plaintiff Maketa's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff Maketa across multiple Screenrant Website sessions and even other websites, as well as de-anonymize Plaintiff Maketa by synchronizing her user profile amongst each other and with other entities. *See* Figures 7, 9-10, 12-14, 17, 19-20, 27, *supra*.

221. Defendants and the Third Parties used the information collected by the Trackers to

(i)     identity Plaintiff Maketa and either create a new profile of her in the Third Parties' databases or match Plaintiff Maketa to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile)

(ii)    sell Plaintiff Maketa's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Screenrant Website and the information contained on any profiles of Plaintiff Maketa (which are linked to Plaintiff Maketa via the information collected by the Third Parties on the Screenrant Website)

(iii)   actually target Plaintiff Maketa with advertisements and serve advertisements on Plaintiff Maketa based on the information collected by the Third Parties on the Screenrant Website and the information contained on any profiles of Plaintiff Maketa (which are linked to Plaintiff Maketa via the information collected by the Third Parties on the Screenrant Website)

(iv)    de-anonymize Plaintiff Maketa and generate revenue from the sale of Plaintiff Maketa's information—both what is collected on the Screenrant Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendants', advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

222. As an example, as described above, Defendants installed the ADNXS Tracker on Plaintiff Maketa's browser. Defendants and Microsoft knew Plaintiff was communicating with the Website from California based on Plaintiff Maketa's IP address. Microsoft solicited bids from advertisers on Plaintiff Maketa's information and synced with data brokers to better identify Plaintiff Maketa and solicit higher bids. As reflected in the below bid request from Plaintiff Maketa's browser traffic, one advertisers bid to show Plaintiff Maketa (and other Californians) an advertisement

through the ADNXS Tracker on a banner on the Website and was willing to pay approximately $0.57

CPM (or "cost per mille")[144] to do so (relevant portions highlighted in red boxes):

**Figure 28:**



223.    In other words, by installing and using the Third Parties' Trackers, Defendants and

the Third Parties (i) identified Plaintiff Maketa by tying the information collected from her on the

Screenrant Website to profiles maintained by the Linked Data Brokers; and (ii) offered her data up

for sale to interested advertisers through the real-time bidding process.

224.    Plaintiff Maketa did not provide her prior consent to Defendants to install or use the

Trackers on her browser.  Nor did Defendants obtain a court order before installing or using the

Trackers.

225.    Thus, Plaintiff Maketa has had her privacy invaded by Defendants' violations of

CIPA § 638.51(a), and Defendants have likewise been unjustly enriched through the Third Parties'

surreptitious and unconsented-to collection of Plaintiff Maketa's data.

---

[144] "CPM (cost per mille) is a paid advertising option where companies pay a price for every 1,000 impressions an ad receives.  An 'impression' refers to when someone sees a campaign on social media, the search engines or another marketing platform."  CPM, SPROUT, https://sproutsocial.com/glossary/cpm/.

226. Accordingly, Plaintiff Maketa has been injured by Defendants' violation of the CIPA.

**B.    Plaintiff Peppers**

227. Plaintiff Peppers has regularly visited the Polygon Website on his desktop browser during the class period, as long ago as 2023 and as recently as April 2025.

228. When Plaintiff Peppers visited the Polygon Website, the Screenrant Website's code—as programmed by Defendants—caused the Third Parties' Trackers to be installed on Plaintiff Peppers' browser. *See* Figures 5, 16, *supra*. Defendants also caused the Linked Data Brokers' trackers to be installed on Plaintiff Peppers' browser. *See* Figures 8, 11, 18, 21, *supra*.

229. Through their respective Trackers, the Third Parties collected Plaintiff Peppers' IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff Peppers across multiple Polygon Website sessions and even other websites, as well as de-anonymize Plaintiff Peppers' by synchronizing his user profile amongst each other and with other entities. *See* Figures 8-9, 11-12, 18-19, 21, 27, *supra*.

230. Defendants and the Third Parties used the information collected by the Trackers to

(i)    identity Plaintiff Peppers and either create a new profile of him in the Third Parties' databases or match Plaintiff Peppers to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile)

(ii)   sell Plaintiff Peppers' information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Polygon Website and the information contained on any profiles of Plaintiff Peppers (which are linked to Plaintiff Peppers via the information collected by the Third Parties on the Polygon Website)

(iii)  actually target Plaintiff Peppers with advertisements and serve advertisements on Plaintiff Peppers based on the information collected by the Third Parties on the Polygon Website and the information contained on any profiles of Plaintiff Peppers (which are linked to Plaintiff Peppers via the information collected by the Third Parties on the Polygon Website)

(iv)   de-anonymize Plaintiff Peppers and generate revenue from the sale of Plaintiff Peppers' information—both what is collected on the Polygon Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendants', advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

231.    As an example, as described above, Defendants installed PubMatic's tracker on Plaintiff Peppers' browser.  PubMatic is one of the Linked Data Brokers with whom Microsoft's ADNXS Tracker syncs.  PubMatic also provides a supply-side platform and thus is involved in selling Defendants' users' data to advertisers.[145]

232.    In the below excerpt of traffic from Plaintiff Peppers' browser on the Polygon Website, PubMatic received "bid responses" on its offer to sell Plaintiff Peppers' user data from interested advertisers represented by a DSP like Microsoft.  A "bid response" is "the advertiser's response to a publisher's bid request.  When an advertiser decides that ad inventory offered via a bid request suits their criteria, they can respond with a bid through the RTB system. This bid response will include details about the bid as well as information on the ad campaign and the bidder."[146]  In particular, PubMatic received bid responses from Clorox and Dell to fill the same banner ad space.[147]  The dimensions of the banner ad are listed as particular pixels—the values for the "h" (height) and "w" (width) parameters.  While Clorox presumptively won the ad auction by offering a higher CPM to show Plaintiff Peppers an advertisement, importantly, *both advertisers* received all of the information PubMatic and any of the entities it syncs with (*e.g.*, Microsoft and each of the Linked Data Brokers Microsoft syncs with) knows.

//

//

//

//

//

//

//

---

[145] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[146] BID RESPONSE, SMARTCLIP, https://smartclip.tv/adtech-glossary/bid-response/.

[147] "Banners are the creative rectangular ads that are shown along the top, side, or bottom of a website in hopes that it will drive traffic to the advertiser's proprietary site, generate awareness, and overall brand consideration."  WHAT IS BANNER ADVERTISING?, https://advertising.amazon.com/library/guides/banner-advertising.

**Figure 29:**

```
      "id": "0AF3CB2C-50E4-43D7-839C-75BBC4FC7DEA",
      "impid": "46fdc9bf98bfdf3",
      "price": 1.468899,
      "adm": "<VAST version=\"4.0\">\n<Ad id=\"1\">\n<Wrapper>\n<AdSys
      "adomain": ["clorox.com"],
      "cid": "23261",
      "crid": "580026952883600853",
      "h": 306,
      "w": 544,
      "dur": 15,
      "mtype": 2,
      "ext": {
        "dspid": 290,
        "wDSPByrId": "AMZN5CMMEGUQXEGS",
        "advid": 10538,
        "video": {},
        "bidtype": 1
      }
    }]
  }, {
    "seat": "1284",
    "bid": [{
      "id": "52F950D8-7AC4-4AAD-8BC7-BBFC3DCA5814",
      "impid": "47f9433933b80748",
      "price": 0.761933,
      "adm": "<VAST version=\"4.0\">\n<Ad id=\"1\">\n<Wrapper>\n<AdSys
      "adomain": ["dell.com"],
      "cid": "22987",
      "crid": "636816216",
      "h": 306,
      "w": 544,
      "dur": 15,
      "mtype": 2,
      "ext": {
```

233.    In other words, by installing and using the Third Parties' Trackers, Defendants and the Third Parties (i) identified Plaintiff Peppers by tying the information collected from him on the Polygon Website to profiles maintained by the Linked Data Brokers; and (ii) offered him data up for sale to interested advertisers through the real-time bidding process.

234.    Plaintiff Peppers did not provide his prior consent to Defendants to install or use the Trackers on his browser.  Nor did Defendants obtain a court order before installing or using the Trackers.

235.    Thus, Plaintiff Peppers has had his privacy invaded by Defendants' violations of CIPA § 638.51(a), and Defendants have likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff Peppers' data.

236.    Accordingly, Plaintiff Peppers has been injured by Defendants' violation of the CIPA.

## CLASS ALLEGATIONS

237.    **Class Definitions:** Pursuant to Fed. R. Civ. P. Rule 23(a) and 23(b)(3), Plaintiffs seek to represent the following Classes:

> All California residents who accessed the Screenrant Website while in California and had their IP address, Device Metadata, and/or unique identifiers collected by the Trackers (the "Screenrant Class").

> All California residents who accessed the Polygon Website while in California and had their IP address, Device Metadata, and/or unique identifiers collected by the Trackers (the "Polygon Class").

238.    The following people are excluded from the Classes: (i) any Judge presiding over this action and members of her or her family; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiffs' counsel and Defendants' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

239.    **Numerosity:** The number of people within the Classes are substantial and believed to amount to thousands, if not millions of people.  It is, therefore, impractical to join each member of the Classes as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Classes renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Classes are ascertainable and identifiable from Defendants' records and/or the records of the Third Parties and/or Linked Data Brokers.

240.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(i)    Whether Defendants violated CIPA § 638.51(a);

(ii)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(iii)    Whether Defendants sought or obtained prior consent—express or otherwise—from Plaintiffs and the Class;

(iv)    Whether Defendants sought or obtained a court order for their use of the Trackers; and

(v)    Whether Plaintiffs and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

241.    **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like all other Class Members, visited the Websites and had their IP address, Device Metadata, and unique user identifiers recorded by the Trackers, which were installed and used by Defendants.

242.    **Adequate Representation:** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

243.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also

presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 638.51(a)

244.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

245.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendants.

246.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

247.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

248.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiffs' and the Classes' computers or smartphones.  Cal. Penal Code § 638.50(b).

249.    Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that are being used to ascertain the identity of visitors to Defendants Websites, and are thus capturing "addressing" information.  *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

250.    At all relevant times, Defendants installed the Trackers—which are pen registers—on Plaintiffs' and members of the Classes' browsers, which allowed the Third Parties to record or decode Plaintiffs' and members of the Classes' IP addresses and Device Metadata.  The Trackers also set a unique user identifier on Plaintiffs' and members of the Classes' browsers so the Third Parties could de-anonymize Plaintiffs' and members of the Classes' and track them across multiple Website sessions and multiple websites.

251.    Defendants and the Third Parties used the information collected by the Trackers to:

(i)    identity Plaintiffs and members of the Classes and either create new profiles of them in the Third Parties' databases or match Plaintiffs and members of the Classes to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(ii)    sell Plaintiffs' and members of the Classes' information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Websites and the information contained on any profiles of Plaintiffs and members of the Classes (which are linked to Plaintiffs and members of the Classes via the information collected by the Third Parties on the Websites);

(iii)    actually target Plaintiffs and members of the Classes with advertisements and serve advertisements on Plaintiffs and members of the Classes based on the information collected by the Third Parties on the Websites and the information contained on any profiles of Plaintiffs and members of the Classes (which are linked to Plaintiffs and members of the Classes via the information collected by the Third Parties on the Websites); and

(iv)    (iv) de-anonymize Plaintiffs and members of the Classes and generate revenue from the sale of Plaintiffs' and members of the Classes' information—both what is collected on the Websites by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendants', advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

252.    The Trackers do not collect the contents of Plaintiffs' and members of the Classes' electronic communications with the Websites.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

253.    Plaintiffs and members of the Classes did not provide their prior consent to Defendant's installation or use of the Trackers.  Nor did Defendant obtain a court order to install or use the Trackers.

254.    Pursuant to Cal. Penal Code § 637.2(a), Plaintiffs and members of the Classes have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

    (a)    For an order certifying the Classes, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

    (b)    For an order declaring that Defendants' conduct violates the statutes referenced herein;

    (c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

    (d)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

    (e)    For pre- and post-judgment interest on all amounts awarded; and

    (f)    For an order awarding Plaintiffs and the Classes their reasonable attorney's fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: August 28, 2025        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Kaili C. Lynn*
    Kaili C. Lynn

L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455

Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
    klynn@bursor.com
    jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiffs*