**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

DASSAH MAKETA and BRYCE PEPPERS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

VALNET INC. AND VALNET U.S., INC. D/B/A SCREENRANT.COM,

Defendants.

Case No. 3:25-cv-05517-RS

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Date: October 16, 2025
Time: 1:30 p.m.
Ctrm: 3 – 17 Floor
Judge: Hon. Richard Seeborg

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. CIPA §§ 638.50-638.51 APPLY TO DEFENDANTS' CONDUCT ..... 3

A. The Plain Text Of The CIPA, Which Controls, Defines A "Pen Register" Expansively ..... 3

B. To The Extent The Court Considers It, California Supreme Court Precedent And The Legislative History Support Applying The CIPA To Defendants' Conduct ..... 7

II. THE TRACKERS RECORD AND DECODE "ROUTING, ADDRESSING, OR SIGNALING INFORMATION," BUT NOT THE CONTENTS OF PLAINTIFFS' COMMUNICATIONS WITH THE WEBSITES ..... 8

III. DEFENDANTS' ARGUMENTS ABOUT IP ADDRESSES ARE UNPERSUASIVE ..... 11

A. Defendants' Installation And Use Of The Trackers Inured Plaintiffs The Trackers Allowed Plaintiffs To Be Linked To Non-Anonymous Profiles Through His IP Address And Other Information That Were Sold To Advertisers Without Consent ..... 12

B. Plaintiffs Did Not Voluntarily Provide Their Personal Information To Third Party Data Brokers ..... 14

C. Defendants' Remaining Authorities Are Distinguishable ..... 17

IV. PLAINTIFFS ALLEGE THE REMAINING ELEMENTS OF A CIPA CLAIM ..... 19

A. The Trackers "Record And Decode" Information ..... 20

B. Plaintiffs' And Class Members Computers Or Smartphones Are The "Instruments Or Facilities" From Which Electronic Communications Are Transmitted ..... 21

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ambriz v. Google, LLC*,
2025 WL 830450 (N.D. Cal. Feb. 10, 2025) ... 22

*Application of U.S. of Am. for an Ord. Authorizing Use of a Cellular Tel. Digital Analyzer*,
885 F. Supp. 197 (C.D. Cal. 1995) ... 6

*Britton v. County of Santa Cruz*,
2020 WL 4197609 (N.D. Cal. July 22, 2020) ... 12

*Capitol Recs. Inc. v. Thomas-Rasset*,
2009 WL 1664468 (D. Minn. June 11, 2009) ... 15

*Collier v. SP Plus Corp.*,
889 F.3d 894 (7th Cir. 2018) ... 12

*Columbia Pictures Industries v. Bunnell*,
2007 WL 2080419 (C.D. Cal. Mar. 29, 2007) ... 15

*Cooper v. Bonobos, Inc.*,
2022 WL 170622 (S.D.N.Y. Jan. 19, 2022) ... 18

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve. System*,
603 U.S. 799 (2024) ... 1, 4, 7

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2541952 (N.D. Cal. Sept. 4, 2025) ... passim

*Digital Shape Techs., Inc. v. Glassdoor, Inc.*,
2016 WL 5930275 (N.D. Cal. Oct. 12, 2016) ... 18

*Flanagan v. Flanagan*,
27 Cal.4th 766 (2002) ... 7

*Gabrielli v. Haleon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) ... 11

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) ... passim

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) ... passim

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) ... 8

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ........ passim

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........ 15

*Heiting v. FKA Distributing Co.*,
2025 WL 736594 n.3 (C.D. Cal. Feb. 3, 2025) ........ 5

*In re Facebook, Inc. Internet Trcking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 14

*In re Meta Pixel Tax Filing Cases*,
2025 WL 2243615 (N.D. Cal. Aug. 6, 2025) ........ 10, 11

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 20

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ........ 17

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) ........ 18, 22

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ........ 7

*Ji v. Naver Corp.*,
2022 WL 4624898 (N.D. Cal. Sept. 30, 2022) ........ 15

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) ........ 3, 12

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ........ 2, 14

*Kishnani v. Royal Caribbean Cruises Ltd.*,
2025 WL 1745726 (N.D. Cal. June 24, 2025) ........ 9, 10

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) ........ passim

*Licea v. Hickory Farms LLC*,
2024 WL 1698147 (Super. Ct. Los Angeles Cnty. Mar. 13, 2024) ........ 6

*Malibu Media, LLC v. Pontello*,
2013 WL 12180709 (E.D. Mich. Nov. 19, 2013) ........ 15

*Malibu Media, LLC v. Doe*,
2019 WL 2537671 (D. Conn. June 20, 2019) .......... 17

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) .......... 7, 8

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024) .......... 3

*Mirmalek v. Los Angeles Times Communications LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... passim

*Mitchener v. CuriosityStream, Inc.*,
2025 WL 2272413 (N.D. Cal. Aug. 6, 2025) .......... 19

*Moody v. C2 Educ. Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) .......... passim

*Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) .......... 15

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) .......... 12, 17, 18

*Riganian v. LiveRamp Holdings, Inc.*,
2025 WL 2021802 (N.D. Cal. July 18, 2025) .......... passim

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .......... passim

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May, 21, 2021) .......... 2

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .......... 22

*Sanchez v. Cars.com Inc.*,
2025 WL 487194 (Super. Ct. Los Angeles Cnty. Jan. 27, 2025) .......... 6

*Scarlett v. Future US, LLC*,
2025 WL 2614587 (Cal.Super. Sep. 05, 2025) .......... passim

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... passim

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) .......... 10

*U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*,
489 U.S. 749 (1989) .......... 17

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ........ 5, 14, 17

*United States v. Jean*,
207 F. Supp. 3d 920 (W.D. Ark. 2016) ........ 19

*United States v. Kidd*,
394 F. Supp. 3d 357 (S.D.N.Y. 2019) ........ 17, 18

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) ........ 6

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) ........ 6

*Valentine v. NebudAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) ........ 6

*Zanotti v. Invention Submission Corp.*,
2020 WL 2857304 (S.D.N.Y. June 2, 2020) ........ 12

*Zarif v. Hwareh.com, Inc.*,
2025 WL 486317 (S.D. Cal. Feb. 13, 2025) ........ 16

**STATUTES**

18 Pa. Stat. and Cons. Stat. Ann. § 5702 ........ 5

18 U.S.C. § 3127 ........ 6

Cal. Civ. Code § 1798.100(a) ........ 6

Cal. Civ. Code § 1798.140(v)(1)(A) ........ 13

Cal. Pen. Code § 631(a) ........ 4, 8

Cal. Pen. Code § 638.50(b) ........ passim

Cal. Pen. Code § 638.51(b)(1) ........ 16

Cal. Pen. Code § 638.52 ........ 5

Plaintiffs Dassah Maketa and Bryce Peppers ("Plaintiffs") respectfully submit this Opposition to Defendants Valnet Inc. and Valnet U.S., Inc. d/b/a Screenrant.com's ("Defendants") Motion to Dismiss the First Amended Complaint (ECF No. 22) (the "Motion" or "MTD").

**INTRODUCTION**

Defendants contend "there is a growing corpus of law" siding with its arguments. MTD at 18:23. On the contrary, court after court has rejected every one of Defendants' arguments and found allegations involving similar technology to that at issue here sufficient to state a claim for violation Sections 638.50-638.51 of the California Invasion of Privacy Act ("CIPA"). *See, e.g.*, *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024); *Riganian v. LiveRamp Holdings, Inc.*, --- F. Supp. 3d ---, 2025 WL 2021802 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957 (N.D. Cal. July 14, 2025); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921 (C.D. Cal. 2025); *Moody v. C2 Educ. Sys. Inc.* 742 F. Supp. 3d 1072, (C.D. Cal. 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33 (S.D.N.Y. 2025).

Indeed, in the two weeks between the filing of the First Amended Complaint (ECF No. 21) (the "FAC") and the Motion, three new decisions were issued that reject Defendants' arguments. *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952 (N.D. Cal. Sept. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 WL 2522374 (N.D. Cal. Sept. 2, 2025); *Scarlett v. Future US, LLC*, No. CGC-25-621912, 2025 WL 2614587, at *4 (Cal.Super. Sep. 05, 2025).

It is clear why the wind is blowing in Plaintiffs' direction. As the Supreme Court has held, "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve. System* 603 U.S. 799, 815 (2024). To that end, the CIPA defines a "pen register" broadly as a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code, § 638.50(b). The authorities Plaintiffs cite above have followed this "plain statutory language" and held this definition applies to software installed on website users' browsers and

operated by third parties that collect users' IP addresses and other information, like Device Metadata[1] and unique user identifiers. *See Garon*, 2025 WL 2522374, at *4. On the other hand, earlier cases going the other way improperly "focused its analysis on [a selective view of] the legislative history of the CIPA rather than on the expansive, plain language of Section 638.50." *See Riganian*, 2025 WL 2021802, at *12. Or, these earlier decisions were issued by courts facing bare-bones pleadings rather than allegations like "the detailed FAC." *Scarlett v. Future US, LLC*, 2025 WL 2614587, at *1 (Cal.Super. Sep. 05, 2025). Whatever the reason, following the CIPA's plain language, Plaintiffs' allegations are sufficient to state a CIPA claim. FAC ¶¶ 4, 33, 35-37, 49-51, 68, 75-78, 80, 110, 116-119, 121, 151, 219, 228, 252.[2]

While the statutory elements of Plaintiffs' claim are simple, the privacy implications are significant. The Third Parties are not just ordinary service providers, but registered data brokers (or data sellers that sync with the same). FAC ¶¶ 82-85, 89, 100, 112, 123, 136-137. When Defendants installed the Trackers on Website users' browsers, these data brokers matched the information they collected directly from Website users (IP addresses, Device Metadata, unique identifiers) to comprehensive user profiles to de-anonymize users, including by connecting their information with profiles held by even more data brokers. *See, e.g.*, *id.* ¶¶ 3-6, 8, 60-63, 75-77, 80-90, 94-95, 99, 101-106, 111, 113-117, 121-124, 128, 131-139, 144-147, 152, 156, 160-172, 189-191, 193, 195-198, 202, 204, 207-214, 220, 229. Defendants and these Third Parties then use the Trackers to sell the profiles through real-time bidding, where these comprehensive profiles are sold to advertisers in the blink of an eye without notice or consent, so Defendants can monetize their Websites. *See, e.g.*, *id.* ¶¶ 178-186, 195-198, 200-201, 205, 215-216, 221-223, 230-233. This conduct—which is done at Defendants' behest and for Defendants' profit—results in significant harm to Website users,

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as in the FAC.

[2] Defendants contend "[t]he majority of California courts interpreting the [CIPA] have dismissed attempts to apply the CIPA provision prohibiting unauthorized wiretapping … to website advertising and analytics technologies." MTD at 8:15-18. This is not remotely true. For instance, this Court sustained a CIPA § 631(a) claim involving "cookies" and "tracking pixels." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 935, 945 (N.D. Cal. 2023) (Seeborg, J.); *see also Rodriguez v. Google LLC*, 2021 WL 2026726, at *6 (N.D. Cal. May, 21, 2021) (Seeborg, J.) ("Plaintiffs … state a viable § 631 basis for relief."). And just last month, a jury found Meta liable for violation CIPA § 632. *See* Matthew Heller, *Big Tech on Trial: Jury Finds Meta Liable for Misusing Women's Health Data*, LAWDRAGON (Aug. 25, 2025), https://tinyurl.com/u8y4st3h.

including Plaintiffs. *Id.* ¶¶ 163-166, 183-187, 221, 230. Indeed, Defendants' installation and use of the Trackers is potentially "the biggest data breach ever recorded." *Id.* ¶ 186 (cleaned up).

Defendants are not some "babe in the woods" who happened to allow these privacy violations to occur. Far from it, Defendants enabled these harms by installing and using the Trackers to turn a profit. *See Deivaprakash*, 2025 WL 2541952, at *4 ("Condé ignores, however, that, as alleged by Deivaprakash, it enabled the third parties to amass information about Deivaprakash by embedding the code in its websites that surreptitiously installed the trackers on Deivaprakash's browser in the first place."); *McClung v. AddShopper, Inc.*, 2024 WL 189006, at *2 (N.D. Cal. Jan. 17, 2024) ("[T]he scheme cannot exist without the participation of the retailers, and the retailers were aware that their participation would cause these intrusions."). In fact, Defendants admit as much in their Motion. MTD at 9:16-17 (admitting Defendants "facilitate or participate in behavioral advertising ecosystems (where third parties collect data)" to "monetize[] [their] Websites primarily through advertising revenue").

On that note, not only do Defendants admit this conduct occurred, by removing this case to federal court (ECF No. 1), Defendants have also implicitly conceded that Plaintiffs were concretely injured by Defendants' conduct alleged here. *Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023) ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction.") (cleaned up). And despite expressing "confusion" over how Plaintiffs' allegations map onto a CIPA claim, Defendants managed to file a 21-page Motion. What is left are arguments that courts across the federal judiciary (and more recent Superior Court judges) have rejected. Plaintiffs respectfully submit this Court should do the same and deny the Motion.

## <u>ARGUMENT</u>

### I. CIPA §§ 638.50-638.51 APPLY TO DEFENDANTS' CONDUCT

#### A. The Plain Text Of The CIPA, Which Controls, Defines A "Pen Register" Expansively

CIPA § 638.50(b) defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." "Nothing in th[at] statutory definition limits pen registers to those that operate the same way as a

traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. To the contrary, the "California Legislature chose[]" "expansive language" for the definition of a "pen register" that "the Court cannot ignore"—language that is "specific as to the type of data a pen register collects," but "vague and inclusive as to the form of the collection tool." *Id.* at 928-29 (cleaned up).

Thus, federal courts in this District and beyond have unanimously held that, under the plain text of CIPA § 638.50(b), online tracking software such as the Trackers at issue here are "pen registers." *See*, *e.g.*, *id.* at 929 (agreeing with "[p]laintiffs' theory [] that the third-party Trackers operate as pen registers under the meaning of the statute because they are processes that record users' IP addressing information"); *Mirmalek*, 2024 WL 5102709, at *3 ("[U]nder the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process…'"); *Deivaprakash*, 2025 WL 2541952, at *2-3 (finding software constituted a "pen register"); *Riganian*, 2025 WL 2021802, at *11-12 (same); *Motorola Mobility*, 2025 WL 1939957, at *11-12 (same); *Garon*, 2025 WL 2522374, at *3-5 (same); *Greenley*, 684 F. Supp. 3d at 1050 (same); *Autotrader.com*, 762 F. Supp. 3d at 929 (same); *Lesh*, 767 F. Supp. 3d at 40 (same); *Moody*, 742 F. Supp. 3d at 1076 (sustaining CIPA § 638.51 claim where "the TikTok Software is embedded in the Website and collects information from visitors"). More recent Superior Court authority has found this "reasoning persuasive and instructive." *Scarlett*, 2025 WL 2614587, at *3.

Resisting this straightforward conclusion, Defendants argue "even though the definition of the 'pen register' *does not explicitly mention landlines*, all elements of the definition are tailored for the types of devices that have been historically understood to be pen registers." MTD at 17:15-19 (emphasis added). However, "the text of a law controls over purported legislative intentions unmoored from any statutory text," and "the Court may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024). And here, as Defendants admit, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. Indeed, "[i]f the drafters of Section 638.50 had intended for 'pen register' to be limited to telephone technologies, they knew how to do so—as evidenced by other sections of CIPA where they imposed such limitations." *Motorola Mobility*, 2025 WL 1939957, at *11 (citing Cal. Pen. Code §§ 631(a)[i],

632.7). Thus, because the "text is clear" that the CIPA's definition of a "pen register" is broader than its traditional form, "the Court's analysis … must end there." *Shah*, 754 F. Supp. 3d at 929.[3]

Defendants further argue that "if interpreted in combination with other CIPA provisions, it is hardly possible to reach a conclusion that 'pen register' can be anything but a physical device installed on a telephone line." MTD at 19:13-14 (citing Cal. Pen. Code § 638.52). "Section 638.52, however, merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line … But that does not alter the statutory definition of a pen register stated in § 638.50(b) or the prohibition on non-law enforcement use of such pen registers." *Shah*, 754 F. Supp. 3d at 930; *see also Lesh*, 767 F. Supp. 3d at 41 (rejecting same argument as Defendants bring here and noting "[t]he Court will not read the term 'telephone' into Section 638.50 just because the word is used in another section of the statute that bears little relevance here"); *Moody*, 742 F. Supp. 3d at 1076 ("Though § 638.52 refers to pen registers and trap and trace devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement."); *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 n.3 (C.D. Cal. Feb. 3, 2025) ("California Penal Code section 638.52, which governs the authorization of the use of pen register or trap and trace devices by law enforcement officers, references telephone lines to which the pen register or trap and trace device is to be attached, but neither section 638.50 nor section 638.51 makes reference to telephone lines.").

Defendants also aver that "CIPA's definition of 'pen register' was copied almost verbatim from federal law," and "[i]t is well established that the federal Pen Register Act's definitions pertain to telephone lines, and not the operation of the websites." MTD at 20:1-5. But the Federal Pen Register Act has been applied to the Internet. *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("We conclude that the surveillance techniques [that reveal IP addresses] are constitutionally

---

[3] Just for comparison, Pennsylvania's pen register statute defines a "pen register" as "[a] device which is used to capture, record or decode electronic or other impulses which identify the *numbers dialed* or otherwise transmitted, with respect to wire or electronic communications, on the targeted *telephone*." 18 Pa. Cons. Stat. § 5702 (emphasis added). Thus, unlike the California Legislature, the Pennsylvania Legislature has limited a "pen register" to only telephonic technology. The absence of a similar definition in the CIPA indicates the California Legislature chose to have the CIPA apply more broadly.

indistinguishable from the use of a pen register."); *see also United States v. Soybel*, 13 F.4th 584, 586-87 (7th Cir. 2021) (pen register installed under federal statute "to monitor internet traffic in and out of the building generally and Soybel's unit specifically"); *United States v. Ulbricht*, 858 F.3d 71, 83 (2d Cir. 2017) (same "to monitor Internet Protocol ('IP') address traffic to and from various devices associated with Ulbricht").[4] Regardless:

> [Defendants'] argument that the *federal* Pen[] Register Act is limited to information transmitted on telephone lines – and thus CIPA should be limited to telephone lines – is without merit. [Plaintiffs] do[] not bring any claims under the federal Pen[] Register Act and, as explained above, CIPA broadly defines "pen register." The Court will not use a similar federal statute so as to read a requirement into the text of a California statute.

*Lesh*, 767 F. Supp. 3d at 41 (emphasis in original); *Moody*, 742 F. Supp. 3d at 1076 (rejecting argument that the CIPA should be limited by the Federal Pen Register Act).[5] Thus, even if the federal pen register law was limited to telephonic devices (and it is not), that would have no bearing on the CIPA. Indeed, the Electronic Communications Privacy Act (the "ECPA"), which encompasses the federal pen register law, does not preempt more protective state laws. *Valentine v. NebudAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011) ("[T]he ECPA does not preempt the CIPA.").

Finally, Defendants contend "there is a growing corpus of law questioning an expansive interpretation of CIPA because it would criminalize otherwise legal internet operations." MTD at 18:23-24 (citing *Sanchez v. Cars.com Inc.*, 2025 WL 487194 (Super. Ct. Los Angeles Cnty. Jan. 27, 2025); *Licea v. Hickory Farms LLC*, 2024 WL 1698147 (Super. Ct. Los Angeles Cnty. Mar. 13, 2024)). Whether Defendants' conduct is "otherwise legal" is highly debated; even the CCPA, like the CIPA, does not permit Defendants to enable data brokers to collect information without informing consumers of the same "at or before the point of collection." *See* Cal. Civ. Code

---

[4] The confusion may stem from the fact that the Federal Pen Register Act used to define a "pen register" as a "device which records or decodes electronic or other impulses which identify the *numbers dialed* or otherwise transmitted *on the telephone line* to which such device is attached." 18 U.S.C. § 3127 (as enacted Oct. 21, 1986) (emphasis added). The Federal Pen Register Act was amended in 2001 with a broader definition that encompasses other types of communications, and it is this definition that the CIPA mirrors.

[5] *Moody* also distinguished *Application of U.S. of Am. for an Ord. Authorizing Use of a Cellular Tel. Digital Analyzer*, 885 F. Supp. 197, 200 (C.D. Cal. 1995), which Defendants rely on. *Moody*, 742 F. Supp. 3d at 1076.

§ 1798.100(a). In any event, federal caselaw has rejected *Sanchez* and *Licea* as "focus[ing] [their] analysis on the legislative history of the CIPA rather than on the expansive, plain language of Section 638.50." *Riganian*, 2025 WL 2021802, at *12 (disagreeing with *Sanchez*); *Garon*, 2025 WL 2522374, at *5 (disagreeing with *Licea* and *Sanchez* because they "reached their conclusions based on an analysis of CIPA's legislative history," as opposed to federal caselaw that "was based on the plain statutory language"); *see also Scarlett*, 2025 WL 2614587, at *1 ("[T]he language of the statute—not a selection from its legislative history—informs the court's analysis."). And again, "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Corner Post*, 603 U.S. at 815. "To the extent that [Defendants] believe[] the statute may impose too many burdens when applied to the realities of modern technologies … the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts." *Shah*, 754 F. Supp. 3d at 933.

### B. To The Extent The Court Considers It, California Supreme Court Precedent And The Legislative History Support Applying The CIPA To Defendants' Conduct

As the plain text of the CIPA is clear and controls, there is no reason to delve into legislative history. Argument § I.A, *supra*. But legislative history also supports an expansive interpretation of the statute. The "CIPA was passed, in part, because 'the development of new devices and techniques for the purpose of eavesdropping upon private communications [] has created a serious threat to the free exercise of personal liberties.'" *Lesh*, 767 F. Supp. 3d at 41 (quoting Cal. Pen. Code § 630). "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan* 27 Cal.4th 766, 775 (2002)). "As such, courts have repeatedly held that [the] provisions of CIPA are not limited to the traditional versions of the tools at issue, based on the plain language of the statute, the California Supreme Court's pronouncements regarding the broad legislative intent underlying CIPA to protect privacy, and the California courts' approach to updating obsolete statutes in light of emerging technologies." *Shah*, 754 F. Supp. 3d at 930-31 (cleaned up); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022)

("Though written in terms of wiretapping, [the second clause of CIPA] Section 631(a) applies to Internet communications."); *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 856 (W.D. Wash. 2024) (holding that "'device,' as used in [CIPA] Section 632, can include software").

Defendants try to sidestep these cases as not addressing this particular provision of the CIPA. MTD at 16:22-23. To be sure, authorities like *Javier* and *Matera* did not address CIPA § 638.51. But the principles they noted were broader and support the proposition that, unless the statutory language indicates otherwise, all provisions of the CIPA should be construed broadly. For instance, as the *Matera* court noted, "the second clause of [CIPA] section 631, as opposed to the first clause, is not limited to communications passing over 'telegraph or telephone' wires, lines, or cables." *Matera*, 2016 WL 8200619, at *18. Thus, the plain language of the CIPA limits the first clause of Cal. Pen. Code § 631(a) to telephone technology, while the second clause does not contain such a limitation and should thus be read more broadly. *Id.* ("[T]he Court finds no reason to conclude that the limitation of 'telegraph or telephone' on 'wire, line, cable, or instrument' in the first clause of the statute should be imported to the second clause of the statute."). CIPA § 638.50 falls in the latter category of broad language without a telephonic limitation. *See Motorola Mobility*, 2025 WL 1939957, at *11.

**II. THE TRACKERS RECORD AND DECODE "ROUTING, ADDRESSING, OR SIGNALING INFORMATION," BUT NOT THE CONTENTS OF PLAINTIFFS' COMMUNICATIONS WITH THE WEBSITES**

Plaintiffs allege that the Trackers are "pen registers" under Cal. Pen. Code § 638.50(b) because they "capture[] the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Websites," which Plaintiffs allege are "routing, addressing, or signaling information." FAC ¶¶ 4, 6, 49-51, 110, 151. Plaintiffs also allege the Trackers are "pen registers" because they are "used to ascertain the identity of the user communicating with the Website[s]." *Id.* ¶¶ 111, 152; *see also Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

Courts have held such pieces of information constitute "routing, addressing, or signaling information" within the meaning of the CIPA. *See, e.g.*, *Deivaprakash*, 2025 WL 2541952, at *2 (sustaining CIPA claim where the "unique user ID, the user's IP address, and/or Device Metadata

…are alleged to be the routing, signaling, or addressing information at issue") (cleaned up); *Scarlett*, 2025 WL 2614587, at *4 (same based on collection of "the IP address, Device Metadata, and unique user IDs … transmitted by Plaintiff's and the Class's computers or smartphones") (cleaned up); *Garon*, 2025 WL 2522374, at *2, *4 (same based on collection of "IP addresses and other device information"); *Shah*, 754 F. Supp. 3d at 929 ("[T]he IP addresses collected by the Trackers fall within the statutory definition of 'addressing' information."); *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff adequately alleges that the Trackers record addressing information in the form of IP addresses."); *Lesh*, 767 F. Supp. 3d at 40 ("[T]he IP addresses collected by the Trackers qualify as 'addressing information' under the statute."); *Autotrader.com*, 762 F. Supp. 3d at 930 (sustaining CIPA claim based on the collection of IP address, "operating system information, browser information, geolocation data, and email addresses"); *Moody*, 742 F. Supp. 3d at 1077 (same and finding "browser and device data plausibly fall within the scope of the statute").

Resisting this authority, Defendants contend that "Plaintiffs cannot claim that Device Metadata … qualifies as 'dialing, routing, addressing, or signaling information' because it is not akin to dialed telephone numbers." MTD at 14:3-5. But "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d 929. "All that is required is that the Trackers record addressing information transmitted by the user's computer … regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Id*. And here, Plaintiffs allege the Device Metadata is "addressing information" because it is used by the Third Parties to "identify Website users." *See, e.g.*, FAC ¶¶ 69, 81, 121. Regardless, Plaintiffs allege that Device Metadata "is analogous to … the specific handset that is making the call," and thus allows the Trackers to distinguish "between devices accessing the same public IP address." *Id.* ¶ 48 n.6.

Relying on *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726 (N.D. Cal. June 24, 2025), Defendants contend "Plaintiffs cannot argue that so-called 'fingerprinting' constitutes recording or decoding 'dialing, routing, addressing, or signaling information'" "as those are the 'contents of a communication.'" MTD at 13:13-14, 13:22. But *Kishnani* is distinguishable. In that case, the plaintiff alleged that the third party software provider collected the user's "name, date of

birth, and address" *directly from the website*. *Id.*, at *4. As the court noted, "[t]he only circumstance the Court can conceive for such information to be available on a commercial website is that the visitor input that information himself. And if the visitor input that data, it follows that the data itself is the content of the visitor's communication with the Website." *Id.*, at *4 n.3 (cleaned up).

Here, however, Plaintiffs do not allege the Trackers collected information Plaintiffs affirmatively input into the Websites (*i.e.*, the "content" of their communications). Instead, Plaintiffs allege that (i) the Trackers collect "addressing information" like IP addresses, Device Metadata, and unique user identifiers, (ii) the Trackers are using this information to match Plaintiffs and Class Members to profiles maintained by data brokers, and (iii) that those profiles contain information like "names, physical addresses, email addresses, … and other information," thus de-anonymizing and identifying Plaintiffs. *See*, *e.g.*, FAC ¶¶ 60, 75-77, 83-84, 87, 89-90, 95, 101, 104-105, 116-118, 123, 132-133, 136, 144, 194-198, 212. Thus, Plaintiffs' use of "fingerprinting" does not mean the contents of Plaintiffs' communications were captured from the Websites. Instead, it means the Trackers capture information about who Plaintiffs are, where they were, and the devices they were using to communicate (*i.e.*, their "routing, addressing, or signaling information"), but *not* the substance of what they were communicating to the Websites (*i.e.*, the "contents"). *See also Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (noting "the characteristics of the message that is generated in the course of the communication" is not content). Instead, the Trackers use these pieces of "routing, addressing, or signaling information" like "keys" to match Plaintiffs up to profiles maintained elsewhere, but not directly collected from affirmative inputs to the Websites.[6] *See Deivaprakash*, 2025 WL 2541952, at *3.

That said, other courts have rejected the argument that software cannot be a "pen register" if it collects both addressing information and the content of the user's communications. *In re Meta Pixel Tax Filing Cases*, --- F. Supp. 3d ---, 2025 WL 2243615, at *5 (N.D. Cal. Aug. 6, 2025) ("[I]t

[6] In addition, Defendants' argument that "[a]lmost exactly the same allegation[s] w[ere] made by the plaintiff in *Kishnani*" is disingenuous. MTD at 13:14-15. Plaintiffs would encourage the Court to review the bare-bones pleading in *Kishnani* (the substantive allegations are only six pages) and compare it to "the detailed FAC." *Scarlett*, 2025 WL 2614587, at *1; *see also Kishnani v. Royal Caribbean Cruises Ltd.*, Case No. 5:25-cv-1473, ECF No. 13 (N.D. Cal. Apr. 4, 2025).

is highly unlikely that the Legislature intended to permit the installation and use of pen registers so long as those devices also record the contents of a third party's communications."); *Gabrielli v. Haleon US Inc.,* 2025 WL 2494368, at *12 (N.D. Cal. Aug. 29, 2025)(same). This is so as a matter of statutory interpretation and as a technological matter, because "the process that records metadata in a pen register-like manner is a separate 'device' or 'process' from the one that collects the contents of users' communications." *In re Meta Pixel Tax Filing Cases*, 2025 WL 2243615, at *6. However, because the Trackers do not record anything resembling content, the Court need not resolve this issue.

Finally, Defendants argue "Plaintiffs' allegations about what happens to the data after transmission to Third Parties are [] irrelevant" because "[d]ata solely held by Third Parties cannot constitute … information covered by CIPA." MTD at 14:1-3 (cleaned up). Plaintiffs are not making that argument. Plaintiffs' IP addresses, Device Metadata, and unique user identifiers are the "routing, addressing, or signaling information" recorded by the Third Parties that fall within the CIPA's ambit. But the profiles maintained by the Third Parties or the Linked Data Brokers are not "irrelevant." Instead, those profiles are relevant to the privacy injury incurred by Plaintiffs through Defendants' installation and use of the Trackers. *Deivaprakash*, 2025 WL 2541952, at *4 ("[T]he privacy violation extends beyond the collection of just his IP address and metadata; it encompasses how that collection allegedly allowed the third parties to: (1) build a profile reflecting his personal information; and (2) interfere with his ability to remain anonymous.").

## III. DEFENDANTS' ARGUMENTS ABOUT IP ADDRESSES ARE UNPERSUASIVE

Defendants argue that "[e]ven if it is assumed that the ability of a website operator to obtain a user's IP address constitutes operating a pen register," "Plaintiffs cannot allege any protected privacy interest in IP addresses." MTD at 14:10-13. It is unclear what argument Defendants are making here. To the extent Defendants are arguing IP addresses are not "addressing information," that argument has been roundly rejected by courts. *See* Argument § II, *supra*. To the extent Defendants are making two different arguments, Plaintiffs address those below.

### A. Defendants' Installation And Use Of The Trackers Inured Plaintiffs The Trackers Allowed Plaintiffs To Be Linked To Non-Anonymous Profiles Through His IP Address And Other Information That Were Sold To Advertisers Without Consent

Defendants may be arguing that because users ostensibly have no protected privacy interest in IP addresses, Plaintiffs have not been injured by the Third Parties' collection of it through their Trackers. As an initial matter, there is no "categorical approach" by courts finding no privacy interest in IP addresses. *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *3 (N.D. Cal. Mar. 28, 2025). On the contrary, "[i]n determining statutory standing under CIPA, courts have held IP address collection for targeted advertisement, creates a concrete injury-in-fact." *Id.* (collecting cases); *see also*, *e.g.*, *Shah*, 754 F. Supp. 3d at 932 (finding statutory standing where "Plaintiffs plausibly allege that the collection of their IP addresses through the Trackers allows the third parties to obtain personally identifying, non-anonymized information, and that the IP addresses reveal geographical location and other personal information sufficient for third parties to conduct targeted advertising.") (cleaned up); *Mirmalek*, 2024 WL 5102709, at *4 (same); *Lesh*, 767 F. Supp. 3d at 39 (same).

Moreover, Defendants' conduct also contradicts any argument that Plaintiffs have not sustained a concrete injury. As both then-Judge Koh and the Ninth Circuit have noted, when a defendant removes a case from state court to federal court, the defendant "must establish subject matter jurisdiction, including Article III standing." *See Britton v. County of Santa Cruz*, 2020 WL 4197609, at *4 (N.D. Cal. July 22, 2020) (Koh, J.); *see also Jones*, 85 F.4th at 573 ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction.") (cleaned up); *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) ("As the party invoking federal jurisdiction, SP Plus had to establish that all elements of jurisdiction—including Article III standing—existed at the time of removal."). A defendant cannot just "rely on CAFA to justify the [C]ourt's continued exercise of jurisdiction over the claims against them." *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *7 (S.D.N.Y. June 2, 2020). And here, Defendants removed this case to federal court (ECF No. 1), which is an implicit concession that Plaintiffs possess Article III standing. Indeed, if Defendants believed there was no injury based on the Third Parties' collection of Plaintiffs' IP address, then its removal would have been improper.

Thus, to the extent Defendants argue Plaintiffs did not suffer any harm, that argument is contradicted by Defendants' removal and implicit concession that Plaintiffs suffered a concrete injury sufficient for Article III standing.

Thus, as Defendants implicitly admit, the collection of Plaintiffs' IP addresses and other information by the Third Parties alone (as caused by Defendants) injured Plaintiffs. However, chalking this case up to the collection IP addresses by the Third Parties oversimplifies Defendants' conduct and trivializes Plaintiffs' harm. As the *Deivaprakash* court held:

> [i]t does not matter whether [Plaintiffs] had a reasonable expectation of privacy in the information collected … because the privacy violation extends beyond the collection of just his IP address and metadata; it encompasses how that collection allegedly allowed the third parties to: (1) build a profile reflecting [Plaintiffs'] personal information; and (2) interfere with [Plaintiffs'] ability to remain anonymous.

*Deivaprakash*, 2025 WL 2541952, at *4. In other words, Plaintiffs' allegations are not just that the Third Parties collected Plaintiffs' IP addresses and other information without consent. The allegations are that, through the information the Third Parties collect, including IP addresses, (i) Website users are identified by being linked to comprehensive, non-anonymous profiles maintained by data brokers; (ii) that such linkage occurs by bypassing the normal "restriction that sites can't read each other[s'] cookies"; and (iii) that those profiles are offered up for sale to a near endless supply of advertisers. *See*, *e.g.*, FAC ¶¶ 81-90, 94-95, 99, 101-106, 111, 113-115, 121-124, 128, 131-139, 144-147, 152, 156, 160-172, 178-186, 189-191, 193, 195-198, 202, 204-205, 207-213, 215-216, 220-223, 229-233.

It is for this reason that the California Legislature considers an "Internet Protocol address" to be "personal information" because it "identifies … or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A); *see also* FAC ¶¶ 60-61, 168-172 (alleging the Third Parties link consumers' IP addresses and Device Metadata to their identities and profiles). And it is why courts have found that the collection of information for the purposes of building, disseminating, and linking consumers to profiles causes a concrete harm: the loss of the consumer's right to control their personal information. *Deivaprakash*, 2025 WL 2541952, at *4 ("Plaintiff alleges a privacy invasion based on the creation of a detailed

profile and his reduced capacity to remain anonymous."); *see also Riganian*, 2025 WL 2021802, at *6 ("[T]he tracking of individuals' activity across thousands of websites, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy."); *Motorola Mobility*, 2025 WL 1939957, at *6 ("Gabrielli's allegations that Motorola deprived him control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Katz-Lacabe*, 668 F. Supp. 3d at 940 (finding a concrete injury based on "Oracle's ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up).[7]

Accordingly, regardless of any "privacy interest" in their IP addresses, Defendants' conduct injured Plaintiffs because the collection of Plaintiffs' IP addresses and other information by the Third Parties "allowed the third parties to: (1) build a profile reflecting [their] personal information; and (2) interfere with [their] ability to remain anonymous." *Deivaprakash*, 2025 WL 2541952, at *4.

### B. Plaintiffs Did Not Voluntarily Provide Their Personal Information To Third Party Data Brokers

Defendants may also be arguing that the CIPA cannot cover IP addresses because "because the collection of IP addresses is necessary for the internet to operate." MTD at 16:7-8. There are many layers of inaccuracy to this argument.

*First*, for the reasons set forth above, Defendants' argument that the Federal Pen Register Act does not cover the collection of IP addresses (MTD at 16:5-8) is wrong, and the scope of the Federal Pen Register Act has no bearing on the scope of the CIPA in any event. *See* Argument § I.A, *supra*; *see also*; *Forrester*, 512 F.3d at 510; *Lesh*, 767 F. Supp. 3d at 41; *Moody*, 742 F. Supp. 3d at 1076.

[7] As another ground for statutory standing, Plaintiffs allege that Defendants derived an unlawful economic benefit through their installation and use of the Trackers. "Because California law recognizes 'an entitlement to unjustly earned profits,' to establish standing, plaintiffs must only establish a stake in the profits garnered from their personal data and that it is unjust for the defendant to retain those profits." *Greenley*, 684 F. Supp. 3d at 1038 (quoting *In re Facebook, Inc. Internet Trcking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020); *Riganian*, 2025 WL 2021802, at *13; FAC ¶ 182 (Defendant's "users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.").

*Second*, the cases Defendants cite involved the collection of IP addresses by the *website operator*. MTD at 16:8-13. That is, "users were directly communicating with the party alleged to be operating the pen register [the website operator] and voluntarily sent that party their IP address." *Shah*, 754 F. Supp. 3d at 932 n.3 (distinguishing *Capitol Recs. Inc. v. Thomas-Rasset*, 2009 WL 1664468 (D. Minn. June 11, 2009), and *Malibu Media, LLC v. Pontello*, 2013 WL 12180709, at *4 (E.D. Mich. Nov. 19, 2013), which Defendants cite); *see also Columbia Pictures Industries v. Bunnell*, 2007 WL 2080419, at *11 (C.D. Cal. Mar. 29, 2007) ("[D]efendants already and necessarily capture [IP addresses] in their RAM … to operate the website."). Some of Defendants' other authorities similarly involve the direct collection of information by the party operating the website or app with which the plaintiff was communicating. *Ji v. Naver Corp.* 2022 WL 4624898, at *1, *3 (N.D. Cal. Sept. 30, 2022) (alleging "Naver owns and operates, and at all relevant times owned and operated, the B612 app" and "Defendants used two apps … to surreptitiously collect vast troves of private and/or personally identifiable user data without user consent") (cleaned up); *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1188 (N.D. Cal. 2020) (plaintiff "allege[d] only that Facebook collected plaintiffs' IP addresses and even then, *only when they were using the Facebook app or were visiting Facebook's website*") (emphasis added).

In contrast, here, Plaintiffs allege their IP addresses were recorded and decoded by *Third Parties* with whom Plaintiffs did not know they were communicating with, nor did they intend to communicate with. *See*, *e.g.*, FAC ¶¶ 3-4, 35, 68, 75-76, 80, 116-117, 121. And "[a] user who consents to disclose their IP address to [Defendants] as part of accessing [their] [W]ebsite[s] does not necessarily consent to disclose their IP address to the third parties operating the Trackers." *Shah*, 754 F. Supp. 3d at 932; *see also Deivaprakash*, 2025 WL 2541952, at *3 ("Deivaprakash also alleges that he did not consent to the trackers' recording of that information from his visit to Condé's website for the purpose of transmitting it to the third parties, thereby defeating any assertion of voluntariness."); *Autotrader.com*, 762 F. Supp. 3d at 930 ("Plaintiff alleges that the tracking software captured more than just her IP address … and that this information was sent to third parties, not just Defendant."); *cf. Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1355-56 (S.D. Cal. 2024) (rejecting argument that "Plaintiffs' very act of sending a communication over the Internet to Carnival

constituted express consent to Carnival's surveillance scheme" because the plaintiff alleged "simultaneous interception by a third party") (cleaned up). Thus, because Plaintiffs' claim involves the collection of their information by *Third Parties* (as caused by Defendants' acts), as opposed to by Defendants itself, the CIPA applies.

*Third*, Defendants also argue "the collection of IP addresses is necessary for the Website to function." MTD at 16:14-15. But again, regardless of why Defendants themselves may collect Plaintiffs' IP addresses, the claim here is about their collection by the Third Parties. And Defendants' installation and use of the Trackers is not so that the Websites can function or "communicate with all users." *Id.* at 16:3. Rather, Plaintiffs allege Defendants install and use these Trackers to enable the Third Parties to de-anonymize users by linking them to profiles, so that those profiles can be sold to advertisers for greater revenue. *See*, *e.g.*, FAC ¶¶ 81-90, 94-95, 99, 101-106, 111, 113-115, 121-124, 128, 131-139, 144-147, 152, 195-198, 202, 204-205, 207-213, 215-216, 220-223, 229-233. Defendants admit as much in their briefing. MTD at 9:16-17 (admitting Defendants "facilitate or participate in behavioral advertising ecosystems (where third parties collect data)" to "monetize[] its Websites primarily through advertising revenue"). None of that is "necessary for the Website[s] to function." *See*, *e.g.*, *Motorola Mobility*, 2025 WL 1939957, at *12 ("Motorola has not established that … it collects the tracked information through the cookies to operate, maintain, and test a wire or electronic communication service.") (cleaned up); *Autotrader.com*, 762 F. Supp. 3d at 930 ("Nor does Defendant argue that the collection of any data by a third party is necessary.").

To be sure, elsewhere in their Motion, Defendants contend "Valnet uses the Software to operate its Website rather than to package data and sell it … for advertising purposes." MTD at 15:14-15 (cleaned up). Of course, Defendants' argument contradicts Plaintiffs' allegations (and Defendants' statements elsewhere in their Motion), which must be taken as true at this stage. And Defendants are only permitted to install and use a "pen register" to "operator … a wire or electronic communication service" if Defendants are a "provider of electronic or wire communication service" (Cal. Pen. Code § 638.51(b)(1)), which Defendants have not demonstrated they are. *See Mirmalek*, 2024 WL 5102709, at *5 ("Defendant fails to establish that it is a 'provider of electronic or wire communication service.'"); *Motorola Mobility*, 2025 WL 1939957, at *12 (same); *Zarif v.*

*Hwareh.com, Inc.*, --- F. Supp. 3d ---, 2025 WL 486317, at *12 (S.D. Cal. Feb. 13, 2025) (same). Regardless, the purpose for which Defendants install and use the Trackers is ultimately "a question of fact not suitable for a Rule 12(b)(6) motion." *Garon*, 2025 WL 2522374, at *6; *see also Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023) ("To the extent Fandom challenges Jackson's factual allegations regarding the purpose of Fandom's data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss.").

Thus, Defendants' argument about the alleged necessity of its own collection of IP addresses to make its Websites work is a red herring. It ignores that Plaintiffs' claim is about the collection of their information by the Third Parties, ignores that it is not necessary for the Third Parties to collect this information, and ignores that the Third Parties are collecting this information to identify users and drive Defendants' advertising revenue, not to make the Websites work.

**C. Defendants' Remaining Authorities Are Distinguishable**

With these principles and understanding of Plaintiffs' claims in mind, Defendants' remaining authorities are distinguishable. As an initial matter, Defendants cite several authorities that address users' expectation of privacy over IP addresses in the Fourth Amendment context. *Forrester*, 512 F.3d at 510; *Malibu Media, LLC v. Doe*, 2019 WL 2537671, at *4 (D. Conn. June 20, 2019); *United States v. Kidd*, 394 F. Supp. 3d 357, 362 (S.D.N.Y. 2019). As noted above, there is no "categorial approach" that "users have no reasonable expectation of privacy in such IP address information." *R.C.*, 2025 WL 948060, at *3.

Regardless, "cases regarding the limits of the Fourth Amendment have no bearing on whether an individual has standing to sue under CIPA, as CIPA provides protection beyond the floor set by the Fourth Amendment." *Lesh*, 767 F. Supp. 3d at 39; *Greenley*, 684 F. Supp. 3d at 1051 ("The fact that law enforcement can install a warrantless pen register without offending the Fourth Amendment is immaterial."); *U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989) ("The question of the statutory meaning of privacy under the FOIA is … not the same as the question whether a tort action might lie for invasion of privacy or the question whether an individual's interest in privacy is protected by the Constitution."). Evidencing this distinction, Judge Victor Marrero, who decided *Lesh* and found statutory standing

under the CIPA based on third parties' collection of IP addresses, was also the same judge who decided *Kidd*, which Defendants cite for the argument that users have no "reasonable expectation of privacy in [] IP addresses" in the context of the Fourth Amendment. MTD at 15:2-3.

*Cooper v. Bonobos, Inc.*, 2022 WL 170622 (S.D.N.Y. Jan. 19, 2022), "was a data breach case" and thus involved a different set of alleged harms than here. *See James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 951 (N.D. Cal. 2023) (distinguishing data breach case from wiretapping case for the purposes of standing). In addition, the plaintiff there did not suffer a concrete injury because he did not plausibly allege how the exposure of his IP address "increased the risk of identity theft or fraud" or allowed hackers to "hack his device." *Cooper*, 2022 WL 170622, at *4 (cleaned up). By contrast, Plaintiffs here have alleged how the collection of IP addresses contributed to their privacy harm (the amassing of, linkage to, and selling of profiles by data brokers). *See*, *e.g.*, FAC ¶¶ 60-63, 81, 87, 156, 168-172, 192, 195-196, 209, 215, 220, 223, 229, 233. And as set forth above, Defendant has conceded Article III standing exists here. *See* Argument § III.A, *supra*.

In *Digital Shape Techs., Inc. v. Glassdoor, Inc.*, 2016 WL 5930275, at *5 (N.D. Cal. Oct. 12, 2016), Judge Corley acknowledged that an IP address "may be used to obtain" users' identities from "the Internet Service Providers (ISPs) associated with the IP addresses." This is analogous to Plaintiffs' allegations here: that an IP address can be associated with profiles held by data brokers to identify individuals. Judge Corley found no privacy harm from requiring the defendant to produce the requested information, however, because "[p]etitioners represented that they will not seek to subpoena the identities of those who read the review." *Id.* But that ruling was clearly distinguishable to Judge Corley when she decided *R.C.*, 2025 WL 948060, at *3 and could not find, "as a matter of law, that disclosure of Plaintiffs' IP addresses and other information Plaintiffs input into the site … is not a concrete and particularized injury sufficient to confer standing."

*Kishnani* is distinguishable for the reasons set forth above. Argument § II, *supra*. Moreover, the *Deivaprakash* court distinguished a case involving an identical pleading by the same plaintiff's counsel in *Kishnani* as not involving "a privacy invasion based on the creation of a detailed profile and his reduced capacity to remain anonymous." *Deivaprakash*, 2025 WL

2541952, at *4 (distinguishing *Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025)); *see also Mitchener*, 2025 WL 2272413, at *2 ("The undersigned judge dismissed a substantively identical complaint from Tauler Smith earlier this summer.") (citing *Kishnani*). And both *Mitchener* and *Kishnani* concerned Article III standing, which Defendants conceded here. Argument § III.A, *supra*.

Finally, the court in *United States v. Jean*, 207 F. Supp. 3d 920, 933 (W.D. Ark. 2016), noted "there is no definitive authority in this Circuit as of yet regarding the privacy interests [] a general user … would have in an IP address." And the *Jean* court declined to hold one way or another because "the FBI did obtain a warrant" to obtain users' IP addresses. *Id.* at 926, 933 (cleaned up). Thus, *Jean* has no bearing here, and involved the Fourth Amendment in any event.

## IV. PLAINTIFFS ALLEGE THE REMAINING ELEMENTS OF A CIPA CLAIM

As a last-ditch effort, Defendants contend Plaintiffs do not "allege what precise data set they contend constitutes 'dialing, routing, addressing, or signaling information,' or how the Software satisfies the other elements of the statutory definition of a 'pen register.'" MTD at 20:22-24. Given Defendants have filed a 21-page Motion in response to the FAC, it is clear Defendants fully understand what conduct and information Plaintiffs allege violated the CIPA. Nor are other courts confused, as they have sustained CIPA claims based on pleadings substantially identical to Plaintiffs'. *See, e.g.*, *Deivaprakash*, 2025 WL 2541952, at *2-3; *Garon*, 2025 WL 2522374, at *3-5; *Scarlett*, 2025 WL 2614587, at *4. In any event, Plaintiffs allege each element of a pen register:

| STATUTORY LANGUAGE | APPLICATION TO FACTS |
|---|---|
| "A device or process that records or decodes" | The ADNXS and OpenX Trackers. *See, e.g.*, FAC ¶¶ 3, 35. |
| "Dialing, routing, addressing, or signaling information" | The users' IP addresses, Device Metadata, and unique user identifiers. *See, e.g.*, FAC ¶¶ 4, 35-37, 49-51, 68, 75-78, 80, 110, 116-119, 121, 151. |
| "Transmitted by an instrument or facility" | "[T]he user's computer or smartphone…" *Shah*, 754 F. Supp. 3d at 929; *see also, e.g.*, FAC ¶¶ 33, 75, 116, 219, 228. |
| "From which a wire or electronic communication is transmitted" | "[T]he transmission of the HTTP request from the user's computer or smartphone to [the] [W]ebsite[s]." *Shah*, 754 F. Supp. 3d at 929; *see also, e.g.*, FAC ¶¶ 33, 75, 116. |

| STATUTORY LANGUAGE | APPLICATION TO FACTS |
|---|---|
| "But not the contents of a communication" | *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3 ("[M]etadata necessarily does not constitute the content of a communication.") (cleaned up); *see also*, *e.g.*, FAC ¶ 252. |

Despite citing *zero authority* or analysis to the contrary, Defendants quibble that neither Plaintiffs, "nor the authorities cited by Plaintiffs, offer any analysis explaining why" certain elements of the CIPA claim are met. *See* MTD at 18:9-12. Plaintiffs address those arguments below.

**A. The Trackers "Record And Decode" Information**

Citing zero authority or analysis to the contrary, Defendants question why "software that transmits data should be deemed to 'record or decode' such data." MTD at 18:10-11. The plain meaning of "record" and "decode" holds the answer.

To "record" means "to register permanently by mechanical means," to "indicate," to "read,"[8] or to "log."[9] Plaintiffs' allegations fit within these definitions. Plaintiffs allege each of the Trackers logs (and thus, "records") several pieces of "routing, signaling, or addressing" information: IP address, Device Metadata, and unique user identifiers. *See* FAC ¶¶ 75-78, 80, 116-119, 121. Indeed, Plaintiffs allege that when the Trackers are installed on users' browsers, they store a "cookie" that "send[s] the user's IP address and Device Metadata along with the unique identifier value" to the Third Parties. *Id.* ¶¶ 77-78, 118-119. And Plaintiffs allege this information is stored and compiled by the Third Parties operating the Trackers into comprehensive user profiles. *See*, *e.g.*, *id.* ¶¶ 168-172, 167-168, 194-195, 202, 204, 208-210, 212. This constitutes "recording." *See*, *e.g.*, *Deivaprakash*, 2025 WL 2541952, at *2 (finding trackers "recorded" information where "the trackers also collect and store users' information, including cookies which uniquely identify each user," and "the trackers store these cookies along with a unique user ID, the user's IP address, and/or Device Metadata") (cleaned up); *Mirmalek*, 2024 WL 5102709, at *4 ("[T]he Trackers record the addressing information by instruct[ing] the user's browser to send … the user's IP address to the

[8] RECORD, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/record.

[9] LOG, MERRIAM-WEBSTER, https://www.merriam-webster.com/thesaurus/log.

Tracker and by stor[ing] a cookie with the user's IP address in the user's browser cache.") (cleaned up); *Scarlett*, 2025 WL 2614587, at *4 (quoting *Shah*, 754 F. Supp. 3d at 928-29).

While recording suffices for the Trackers to be "pen registers," the Trackers also "decode" information. To "decode" means "to recognize and interpret (an electronic signal)" or "to convert … into intelligible form."[10] All modern communications—whether telephonic or over the Internet—involve taking electronic or other impulses or signals and translating them into readable information. For instance, a telephone call works by converting sound waves "into electrical energy:" "[t]he electrical energy travels over wires to another phone," and the electrical energy is "converted … to sound waves again which can be heard by someone on the other end of the phone." VIRGINIA 4-H, THE SCIENCE OF TELEPHONES, https://tinyurl.com/ccsfstae. The Internet is no different:

> Computers connect to each other and to the Internet via wires, cables … and other types of networking infrastructure. All data sent over the Internet is translated into pulses of light or electricity, also called 'bits,' and then interpreted by the receiving computer.

CLOUDFLARE, HOW DOES THE INTERNET WORK?, https://tinyurl.com/bdfhfcby. So, the transmissions captured in the FAC are the readable data that the Trackers have translated from electronic impulses into "routing, addressing, or signaling information," but not the "contents" of those communications. Therefore, the Trackers have "decoded" these impulses and are pen registers.

### B. Plaintiffs' And Class Members Computers Or Smartphones Are The "Instruments Or Facilities" From Which Electronic Communications Are Transmitted

Again citing zero authority or analysis to the contrary, Defendants question "why a browser that sends [] data should be considered 'an instrument or facility.'" MTD at 18:9-12. As an initial matter, most authorities have held that "[f]or purposes of the statute, the instrument or facility from which the electronic communication is allegedly transmitted is the user's computer or smartphone." *Shah*, 754 F. Supp. 3d at 928 (cleaned up); *Mirmalek*, 2024 WL 5102709, at *4 (same); *Scarlett*, 2025 WL 2614587, at *4 (same). The *Lesh* court held that because "[w]hen a user first visits the Website, the browser sends an 'HTTP request' to CNN's server, which then responds with instructions that install the Tracker," the addressing information was "transmitted by an instrument

[10] DECODE, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/decode.

or facility from which a wire or electronic communication is transmitted." *Lesh*, 767 F. Supp. 3d at 40. But "[i]t is artificial to claim that" an internet browser "must be viewed in isolation from the computing device on which it runs" and on which it relies "to work." *James*, 701 F. Supp. 3d at 958; *Lesh*, 767 F. Supp. 3d at 40 (citing *James*); *cf. Ambriz v. Google, LLC*, 2025 WL 830450, at *4 (N.D. Cal. Feb. 10, 2025) ("Google attempts to draw an artificial distinction between itself and GCCCAI [software-as-a-service]…").

So ultimately, the user's Internet browser is the same as the user's computer or smartphone, and either is an "instrument or facility from which a wire or electronic communication is transmitted." Cal. Pen. Code § 638.50(b). This is analogous to "[a] traditional phone pen register," where the telephone is the "instrument" and the call between two parties is the "wire communication." *See Shah*, 754 F. Supp. 3d at 929 ("A traditional phone pen register collects information about a phone call from Party A to Party B … The traditional pen register will then transmit the phone number and length of call to the law enforcement officer."). The only difference here is the user's computer or smartphone is the "instrument" and "the HTTP request to load [the] website" is the "electronic communication." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion. If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: September 22, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Kaili C. Lynn*
Kaili C. Lynn

L. Timothy Fisher (State Bar No. 191626)
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiffs*